**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
VICTOR WEINSTEIN,

                        Plaintiff,

             - against -

GARDEN CITY UNION FREE SCHOOL
DISTRICT,

                      Defendant.
-----------------------------------------------------------X

**MEMORANDUM AND ORDER**

CV 11-2509 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.      PRELIMINARY STATEMENT

      Plaintiff Victor Weinstein ("Plaintiff" or "Weinstein") was employed by the Garden City

Union Free School District ("Defendant" or the "District") in its Maintenance Department for

almost 30 years, up until 2008.  The instant litigation arises out of certain experiences Plaintiff

alleges he had on the job during the last two years of his employment.  According to the Plaintiff,

the District discriminated against him on the basis of his age and his religion during that latter

period, while he was working as a Maintenance Supervisor I, a civil service position.

      Weinstein commenced this litigation asserting claims of employment discrimination

under 42 U.S.C. § 1983 based on purported violations of the Equal Protection Clause of the

Fourteenth Amendment.  *See generally* Compl. [DE 1].  The District has now moved for

summary judgment on all claims [DE 16].  Plaintiff opposes the motion [DE 18].

      Having considered the Memorandum of Law in Support of Defendant's Motion for

Summary Judgment [DE 16-11] ("Def.'s Mem."), Plaintiff's Memorandum of Law in Opposition

to Defendant's Motion for Summary Judgment [DE 20] ("Pl.'s Mem."), the Reply Memorandum

of Law in Further Support of Defendant's Motion for Summary Judgment [DE 17] ("Def.'s

Reply Mem."), the supporting affidavits and declarations as well as the exhibits attached to them, the parties' Rule 56.1 Statements, and the applicable law, the Court GRANTS Defendant's motion for summary judgment for the reasons that follow.

## II.    BACKGROUND FACTS

The following facts are drawn from the pleadings, Defendant's Rule 56.1 Statement, Plaintiff's Rule 56.1 Counterstatement, and the parties' affidavits and memoranda of law in support of or in opposition to the instant summary judgment motion. The facts cited are undisputed unless otherwise noted. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### A.    Plaintiff's Job Duties

Plaintiff commenced employment as a Maintainer with the District in 1980. *See* Compl. ¶ 1. Defendant promoted Plaintiff to the non-competitive civil service title of Maintenance Supervisor I in 1987. *See* Declaration of Melissa Holtzer, Esq. in Support of Def.'s Mot. for Summ. J. ("Holtzer Decl."), Ex. C (Transcript of Pl.'s January 25, 2012 Deposition);[1] Def.'s Rule 56.1 Stat. ¶ 3. The parties do not dispute Plaintiff's previous job responsibilities. As Maintenance Supervisor I, Plaintiff was responsible for the supervision of his subordinates and "possessing lead skills in carpentry, plumbing, electrical work and construction." *See* Def.'s Rule 56.1 Stat. ¶ 4. A Maintenance Supervisor I must also be knowledgeable about construction, electrical, heating, ventilation and air conditioning (HVAC) systems, plumbing, and heating. *Id.* ¶ 5. Typically, a Maintenance Supervisor I will plan, assign, lay out and supervise the work of

---

[1]    All future references to Plaintiff's deposition testimony are designated "Pl.'s Dep. at __."

skilled and semi-skilled personnel performing maintenance tasks.  *Id.* ¶ 6; Nassau County Civil

Service Commission's Class Specification for Maintenance Supervisor I, annexed to the Holtzer

Decl. as Ex. H, at 1.  Moreover, he or she will requisition materials, supplies, and equipment

required for general repair and maintenance, take inventory and maintain adequate stock levels.

*See* Def.'s Rule 56.1 Stat. ¶ 6.  Additionally, a Maintenance Supervisor I is responsible for

periodic inspection of buildings to determine the condition of structural components as well as

electrical and mechanical equipment.  *Id.*  The position requires the supervision and performance

of a wide variety of skilled and semi-skilled tasks.  *Id.*  A Maintenance Supervisor I is also

responsible for providing repair progress reports both orally and in writing to his or her superior.

*Id.*  Finally, a Maintenance Supervisor I is expected to be able to demonstrate initiative,

dependability and the ability to direct, plan, lay out, supervise, and inspect the work of skilled

maintenance workers, among other tasks.  *Id.* ¶ 7.

### B.    Defendant's Organizational Hierarchy

The parties are in agreement regarding Defendant's organizational structure.  *See* Garden

City Public Schools Organizational Chart, annexed to the Holtzer Decl. as Ex. Q.  As

Maintenance Supervisor I, Plaintiff reported to Defendant's Director of Facilities, Frank Russo

("Russo"), who was Director from May 2003 to October 2008.  *See* Def.'s Rule 56.1 Stat. ¶¶ 8-9.

Groundskeeping Department Supervisor Pete Mendoza and the Head Custodians also reported to

Director Russo.  *Id.* ¶¶ 10-11.  Plaintiff adds that Russo also supervised a "crew of maintenance

men, grounds people, and custodial staff" for the District.  Def.'s Rule 56.1 Stat. ¶ 10.

Russo reported to the District's Assistant Superintendent for Business, Al Chase, who

assumed that role in October 2006.  Def.'s Rule 56.1 Stat. ¶¶ 14-15.  Plaintiff asserts that

Assistant Superintendent Chase ("Chase") also oversaw the budget, finances, transportation, facilities, and the school lunch program. Pl.'s Rule 56.1 Stat. ¶ 15.1. Chase was required to report to the Superintendent of Schools, who, in turn, reported to the Board of Education. Def.'s Rule 56.1 Stat. ¶ 17. Plaintiff submits that the budget "essentially goes through" Chase prior to its proposal by the District Superintendent to the Board of Education. Pl.'s Rule 56.1 Stat. ¶ 15.2. Plaintiff adds that Chase was "not even involved in the planning or assignment of projects." *Id.* ¶ 15.3.

The parties dispute whether either Russo or Chase were, in fact, authorized to demote or terminate employees. *See* Def.'s Rule 56.1 Stat. ¶ 18; *see also* Pl.'s Rule 56.1 Stat. ¶ 18. Defendant claims that neither Russo nor Chase were authorized to demote or terminate. *See* Def.'s Rule 56.1 Stat. ¶ 18. On the other hand, Plaintiff contends that the issuance of a "negative letter" (*i.e.*, by Russo) constituted a form of discipline. *See* Pl.'s Rule 56.1 Stat. ¶ 18. Defendant states that the Superintendent makes a recommendation to the Board of Education, which, in turn, votes on any proposed disciplinary action involving an employee. *See* Def.'s Rule 56.1 Stat. ¶ 19. Plaintiff notes that if Chase sought to demote Plaintiff, he was authorized to do so without proceeding with a Civil Service Law § 75 disciplinary proceeding, which according to Plaintiff, "deals with dismissal only." *See* Pl.'s Rule 56.1 Stat. ¶ 18.2.[2]

Russo met with his staff on a daily basis to ensure that the Facilities Department was complying with its objectives. As such, Russo met with Plaintiff daily, Groundskeeping Supervisor Pete Mendoza almost daily, and the Head Custodians and maintenance workers regularly. *See* Def.'s Rule 56.1 Stat. ¶¶ 20-22. The maintenance workers, for example, were

---

[2]     Plaintiff makes reference to an "Article 75 proceeding" in his 56.1 Counterstatement (*see* Pl.'s Rule 56.1 Stat. ¶ 18.2); the Court notes that removal and disciplinary proceedings for civil service employees in New York are governed by Civil Service Law § 75.

4

charged with completing plumbing repairs, electrical work, construction work, and other general maintenance work on a daily basis. *Id.* ¶ 23. The District aimed to complete as much maintenance work as it could do internally without hiring outside the district. *Id*. ¶ 25.

### C.    Plaintiff's Construction Experience

The parties dispute whether Plaintiff had the requisite construction experience necessary to competently perform his duties as a Maintenance Supervisor I. Referencing Plaintiff's deposition, Defendant states that Plaintiff had construction experience on "certain things" (but not on some others) necessary to perform and supervise the construction work expected of someone in that position. *See* Def.'s Rule 56.1 Stat. ¶ 25. Plaintiff claims that as a supervisor, he needed only enough experience to facilitate the delegation of assignments and to provide the materials to his subordinates who would, in turn, undertake the assignments. *See* Pl.'s Rule 56.1 Stat. ¶ 25. Additionally, Plaintiff asserts he was only required to possess enough experience to allow him to advise his crew on how to proceed on any given assignment. *Id*. Plaintiff states that "at the time [he] took the [Nassau County Civil Service] test" in 1987," he possessed some knowledge concerning construction-related tasks. *Id*. ¶ 25.1 (citing Pl.'s Dep. at 51). Plaintiff submits that his deposition testimony about lacking construction experience was in reference to the experience he possessed before he was hired by the District. *Id*. ¶ 25.2.

The parties also take issue with the specific construction skills possessed by Plaintiff during his employment with the District. Referring to Plaintiff's deposition, Defendant points out that Plaintiff lacked the ability to "put up walls," "lay out drop ceilings," or build a cabinet. *See* Def.'s Rule 56.1 Stat. ¶¶ 26-27. In his Counterstatement, Plaintiff explains that he was "reasonably unfamiliar with putting up walls and laying out drop ceilings and that he allowed

other employees to take the lead on such projects." *See* Pl.'s Rule 56.1 Stat. ¶ 26. Plaintiff

contends that he could "adequately supervise" the completion of projects, notwithstanding his

particular level of experience. *Id*. ¶ 26.1. When he testified that he "would never have known

how to build a cabinet," Plaintiff claims he was referring to his own physical ability to do so, not

to his ability to supervise such a project. *See* Def.'s Rule 56.1 Stat. ¶ 27; *see also* Pl.'s Rule 56.1

Stat. ¶ 27.

Plaintiff testified that he delegated carpentry and general contracting work to his

subordinates during his employment with the District and that delegation of such work did not

hinder his willingness to successfully complete such projects. *See* Def.'s Rule 56.1 Stat ¶ 28; *see*

*also* Pl.'s Rule 56.1 Stat. ¶¶ 28.2. Citing Russo's deposition, Defendant states that Plaintiff had

difficulty "understanding or telling people what he wanted done." *See* Def.'s Rule 56.1 Stat. ¶

29 (citing Russo Dep. at 32). In rebuttal, Plaintiff relies on deposition testimony from Russo and

Chase, in which neither of them could recall a specific incident when Plaintiff's "alleged lack of

experience" prevented the completion of a "carpentry or construction project." *See* Pl.'s Rule

56.1 Stat. ¶¶ 28.2-28.3 (citing Transcript of Frank C. Russo's April 25, 2012 Deposition,

annexed to the Holtzer Decl. as Ex. D ("Russo Dep."), at 32; Transcript of Albert Chase's April

25, 2012 Deposition, annexed to the Holtzer Decl. as Ex. "E" ("Chase Dep."), at 29). Plaintiff

maintains that he understood his subordinates' "strengths and weaknesses" and delegated work

where appropriate to exploit their "lead skills." *See* Def.'s Rule 56.1 Stat. ¶ 30; *see also* Pl.'s

Rule 56.1 Stat. ¶ 30. According to the Plaintiff, Defendant mischaracterizes his testimony in

arguing that maintenance workers with "lead skills" were hired to address the shortcomings in

Plaintiff's skillset. *See* Pl.'s Rule 56.1 Stat. ¶ 30. However, Plaintiff testified at his own

deposition that "[t]here were certain things that came up where I was not the lead person, but realized, when they hired individuals to work in maintenance, they hired them for their lead skills." *See* Pl.'s Dep. at 53.

Russo required Plaintiff to complete "small construction tasks" even before he assumed the role of Director of Facilities. *See* Def.'s Rule 56.1 Stat. ¶ 31. Only after Russo commenced his new position did the District begin completing its own "big" construction jobs, which were previously completed by outside subcontractors. *See* Pl.'s Rule 56.1 Stat. ¶ 31.1. Plaintiff testified that he completed some, but not all, of the small construction tasks that he was assigned prior to the commencement of Russo's tenure. *See* Def.'s Rule 56.1 Stat. ¶ 32. Plaintiff would interchange between supervising and personally completing these small construction tasks, which he contends were completed in a satisfactory manner. *Id.* ¶¶ 31-33; Pl.'s Rule 56.1 Stat. ¶¶ 33.1-33.6. Plaintiff relied on his subordinate workers to determine the materials required for construction projects. *See* Def.'s Rule 56.1 Stat. ¶ 34.

### D.    Plaintiff's Allegations

#### 1.    *The Kennedy Hiring Decision*

Plaintiff claims that Russo failed to include him in the decision to hire maintenance worker William Kennedy in September 2007. *See* Def.'s Rule 56.1 Stat. ¶ 36. With Russo's predecessors, Plaintiff played a role in the hiring of maintenance workers. *See* Pl.'s Rule 56.1 Stat. ¶ 36.1. Prior to the Kennedy hiring, only one worker, Elmer Lopez, was hired during Russo's tenure. *See* Def.'s Rule 56.1 Stat. ¶¶ 37-38. Russo had consulted with Plaintiff in the decision to hire Lopez in 2003. *Id.* ¶ 39. Disputing Defendant's assertion that he "did not get along with Elmer Lopez," Plaintiff contends that he "only had one isolated incident with Mr.

Lopez." *Id.* ¶ 40; Pl.'s Rule 56.1 Stat. ¶ 40. Plaintiff never asked Director Russo why he was not included in the decision to hire Kennedy. *See* Def.'s Rule 56.1 Stat. ¶ 41.

## 2. *Plaintiff's Objections to Russo's Supervision*

Russo questioned the work of maintenance workers under Plaintiff's supervision on a number of occasions. *See* Def.'s Rule 56.1 Stat. ¶ 42. In Spring 2007, Plaintiff testified that he had not spoken with the men in his department and did not know "what was completed, what not completed, et cetera." *Id.* ¶¶ 43-44. Plaintiff was offended at that time because Russo questioned him "about assignments his men were working on in front of his men rather than in private," since Russo was aware that Plaintiff had not yet conferred with his subordinates. *Id.* ¶ 45; Pl.'s Rule 56.1 Stat. ¶ 45. The parties dispute whether Russo criticized Plaintiff in front of his subordinates. *See* Def.'s Rule 56.1 Stat. ¶ 46; Pl.'s Rule 56.1 Stat. ¶ 46. Although Plaintiff concedes that Russo "did not say anything to criticize him," he found Russo's behavior belittling. Pl.'s Rule 56.1 Stat. ¶ 46. Plaintiff could only recall Russo asking him, "What are your men doing?" Def.'s Rule 56.1 Stat. ¶ 47.

In another instance on November 8, 2007, Russo noticed that Plaintiff's maintenance workers were running late to work and Russo asked whether he knew what was going on. *See* Def.'s Rule 56.1 Stat. ¶ 49. In response, Plaintiff, in a "loud voice," asked Russo why he was questioning him. *Id.* ¶¶ 50-51. Russo asked Plaintiff why he questioned his right to be present at the worksite given his status as Plaintiff's supervisor. *See* Def.'s Rule 56.1 Stat. ¶ 53; Pl.'s Rule 56.1 Stat. ¶ 53. Nonetheless, Plaintiff continued to object to Russo's presence. Def.'s Rule 56.1 Stat. ¶ 55.

The parties dispute the reasons why Plaintiff objected to Russo's presence in the workshop. *See* Def.'s Rule 56.1 Stat. ¶ 56; Pl.'s Rule 56.1 Stat. ¶ 56. Defendant states that Plaintiff questioned Russo in order to make him look "foolish." *See* Def.'s Rule 56.1 Stat. ¶ 56. Plaintiff asserts that questioning Russo was "acceptable" because Plaintiff had been questioned by Russo in the presence of his own subordinates on four occasions. *See* Pl.'s Rule 56.1 Stat. ¶ 56. As a result of this interaction, on November 16, 2007, Russo wrote Plaintiff a counseling memorandum, which memorialized the events of November 8, 2007 as follows:

> I was in the Middle School maintenance shop speaking with members of the maintenance staff. You came into the room and in a loud tone of voice began asking me what my problem was. You questioned why I was present in the maintenance shop and stated that I was there to check up on you. You further stated that I never check up on any other groups and challenged me as a supervisor, challenging my supervisory skills.
>
> I then told you to send the other men to their duties so you and I could speak privately, which was more appropriate. At that point, you continued your tirade, stating that you are the only person who is checked on, and somehow was being singled out.
>
> Your behavior was inappropriate, calling into question my authority as supervisor in the presence of other staff. Further incidents of this nature will be grounds to seek disciplinary action against you.
>
> I advise you that, should you have any issue or question regarding my supervision of the Facilities Department that you seek me out to engage in a private discussion.

*See* November 16, 2007 Letter from Frank Russo to Plaintiff, annexed to the Holtzer Decl. as Ex. G. Plaintiff disputes the characterization of his behavior as a "tirade." *See* Pl.'s Rule 56.1 Stat. ¶ 57. The parties agree, nonetheless, that Russo also attended to other supervisors' work

areas, including that of Head Custodian Baltazar Rodriguez. *See* Def.'s Rule 56.1 Stat. ¶ 58; Pl.'s Rule 56.1 Stat. ¶ 58.

On several occasions, Russo also met with Mendoza's subordinates upon their arrival at work in the morning. *See* Def.'s Rule 56.1 Stat. ¶ 60. Head Custodian Beska, however, told Plaintiff that he was not questioned by Russo in front of his men. Def.'s Rule 56.1 Stat. ¶ 61. Plaintiff testified that Beska might be 61 since he is five years younger than Plaintiff, who is 66. *Id.* ¶ 63. However, unlike Plaintiff, Beska is not Jewish. Pl.'s Rule 56.1 Stat. ¶ 62. Although Plaintiff claims that he did not discuss Russo's conduct with any other employees, Plaintiff testified that he had also spoken to middle school head custodian Maurice Mullin who informed Plaintiff that he was not questioned in the presence of other workers. Def.'s Rule 56.1 Stat. ¶ 64; Pl.'s Rule 56.1 Stat. ¶ 64. Finally, the parties agree that, in addition to Russo, head custodians were also supervised by the principal of their respective buildings. Def.'s Rule 56.1 Stat. ¶ 65. Plaintiff claims that the school principals assigned work to head custodians only when there was "something they were unhappy about." Pl.'s Rule 56.1 Stat. ¶ 66. On the other hand, the District argues the head custodians received assignments from both the principals and Director of Facilities. Def.'s Rule 56.1 Stat. ¶ 66.

### 3. *Russo's Alleged Discriminatory Comments*

Plaintiff claims that Russo made two comments about Jews in 2007. *See* Def.'s Rule 56.1 Stat. ¶ 67. On the first occasion, according to Plaintiff, Russo walked into his office to talk about a vendor, closed the door, and said "I want you to call up Expert Welding and Jew him down." *See* Pl.'s Rule 56.1 Stat. ¶ 67.3 (citing Pl.'s Dep. at 95). Plaintiff testified that he was taken aback by the remark. Pl.'s Dep. at 96. Although Russo testified that he considered "Jew

him down" to be derogatory, he denied making this comment to Plaintiff. Russo Dep. at 65-66.

Assistant Superintendent Chase agreed that such a comment was inappropriate in the workplace.

Chase Dep. at 55. Chase added that Russo and Plaintiff had a relationship in which "they would

joke with one another" and he was not certain whether the comment was made in a "malicious"

or "demeaning way." *Id*. at 54. No one witnessed Russo's alleged comment, nor did Plaintiff

complain about the comment to Russo or to anyone employed by Defendant. Def.'s Rule 56.1

Stat. ¶¶ 70-72.

On a second occasion in or about November 2007, Plaintiff testified that Russo

approached him in his office during lunchtime and asked him whether Athletic Director Nancy

Kalafus was Jewish because "she wants everything for nothing." *See* Pl.'s Rule 56.1 Stat. ¶ 67.6

(citing Pl.'s Dep. at 95, 97). Like the other alleged comment, no one else was present when the

comment was purportedly made by Russo nor did Plaintiff complain about the comment to

Russo or anyone employed by Defendant (including Assistant Superintendent Chase, the

Superintendent, or the Board of Education). *See* Def.'s Rule 56.1 Stat. ¶ 70-72, 74-76. Plaintiff

testified that he discussed the comments with a maintenance worker employed by Defendant but

could not recall the worker's name. Def.'s Rule 56.1 Stat. ¶ 73. Although Defendant states that

Plaintiff never discussed the comments with his union, Plaintiff testified that he "went to the

union about it," but they declined to address the matter because it was "not a union issue."

Def.'s Rule 56.1 Stat. ¶ 77; Pl.'s Dep. at 99-100. Notably, the parties do not dispute that these

were the only two alleged comments made by Russo to Plaintiff about Jews and that both

statements were allegedly made in 2007. Def.'s Rule 56.1 Stat. ¶¶ 68-69.

#### 4. *The June 19, 2008 Meeting Concerning Plaintiff's Performance*

On June 19, 2008, Chase and Russo began to receive complaints about Plaintiff from his subordinates. *See* Def.'s Rule 56.1 Stat. ¶ 81; *see also* June 27, 2008 Memorandum from Al Chase to Plaintiff, annexed to the Holtzer Decl. as Ex. I. The District's maintenance workers advised Chase and Russo that Plaintiff was often unprepared for jobs due to his failure to bring appropriate materials with him. *See* Def.'s Rule 56.1 Stat. ¶ 83. Further, the workers complained that Plaintiff would neglect to assign them work until the morning of a job. *Id.* ¶ 84. If a job had been completed, the workers complained that they would often have to wait for Plaintiff to advise them on their next assignment. *Id.* ¶ 85. Plaintiff's failure to plan ahead would unnecessarily cause time to be wasted during the work day. *Id.* ¶ 86. Plaintiff's subordinates complained about his lack of construction experience. *Id.* ¶ 87.

Plaintiff disputes the foregoing characterization of his performance and points out that he was never "personally informed by any of his subordinates that they had any problems with his supervision or leadership." Pl.'s Rule 56.1 Stat. ¶ 81. Citing his deposition testimony, Plaintiff asserts that no one ever complained about the fact that he could not always lead the construction projects prior to Russo's tenure. *Id.* ¶ 81.1. Moreover, Plaintiff claims that Russo was aware of his "relative strengths and weaknesses" when Russo began his tenure and there was "no issue with his ability to be an effective maintenance supervisor at that time." *Id.* ¶ 81.6. Defendant submits that the maintenance workers under Plaintiff's supervision claimed that Plaintiff was not providing adequate instruction and supervision. Def.'s Rule 56.1 Stat. ¶ 82. In disputing this, Plaintiff states that if he was incompetent in a position he had occupied for over twenty years, he would have already been transferred or terminated. Pl.'s Rule 56.1 Stat. ¶ 82.1.

In 2008, Plaintiff met with Assistant Superintendent Chase and Director Russo to discuss his supervisory skills, although Plaintiff claims that he was told that the meeting would concern his upcoming projects. *See* Def.'s Rule 56.1 Stat. ¶¶ 89-90; *see also* Pl.'s Rule 56.1 Stat. ¶ 90. Nor does Plaintiff agree that there were "issues" concerning his supervisory skills which required discussion. *See* Pl.'s Rule 56.1 Stat. ¶ 90.1. Chase began the meeting by asking Plaintiff why he was not knowledgeable about certain construction tasks. *See* Def.'s Rule 56.1 Stat. ¶¶ 91-92. In response, Plaintiff acknowledged that he had not worked in construction and noted that he specialized in heating and ventilation and lacked confidence in directing other activities. *Id.* ¶¶ 93-94. Plaintiff testified that on "certain things" he had the experience necessary to perform or supervise construction work. *Id.* ¶ 95. He stated that the District hired maintenance workers with "lead skills" in areas of construction to work in areas where Plaintiff could not lead. *Id.* ¶ 96. Plaintiff relied on his subordinates to advise him about materials he needed to order for construction projects. *Id.* ¶ 97. Chase was worried that Plaintiff lacked the skills required to supervise his subordinates on construction tasks, that projects were not being completed in a timely and satisfactory manner, and that Plaintiff's own subordinates had to instruct Plaintiff on how to perform certain tasks. *See* Def.'s Rule 56.1 Stat. ¶¶ 98-100.

Plaintiff disagrees with this account of the 2008 meeting. Plaintiff submits that the deposition testimony concerning his lack of construction experience was related to his "construction background" *before* he was hired by Defendant, not the construction work he performed while employed by Defendant. *See* Pl.'s Rule 56.1 Stat. ¶ 93. Referring to his deposition, Plaintiff states that he never told Chase or Russo that he was unable to work on construction projects. *Id.* ¶ 93.2 (citing Pl.'s Dep. at 268). Plaintiff clarified that he did not work

in "certain areas" of construction and was "shocked and flabbergasted" by the accusations concerning his lack of construction knowledge. *Id*. ¶ 94. In any event, Plaintiff submits that his lack of experience in a certain area of construction did not affect his ability to adequately supervise his workers on such projects. *Id*. ¶¶ 95.1 – 95.5. Furthermore, Plaintiff notes that Chase could not recall a single instance where Plaintiff abandoned his supervisory duties on any project. *Id*. ¶ 99.4.

During the June 2008 meeting, Chase expressed his concern that Plaintiff was unable to perform the duties of a Maintenance Supervisor I. *See* Def.'s Rule 56.1 Stat. ¶¶ 102-103. Specifically, Chase was concerned with Plaintiff's ability to determine the materials and supplies required for projects, to maintain adequate inventory levels, to determine building conditions, and to perform electrical work in a proficient manner. *Id*. ¶ 103. Chase and Russo expected Plaintiff to be capable of leading his subordinates, to be aware of the materials necessary for the completion of projects, and to be able to answer his subordinates' work-related questions. *Id*. ¶¶ 106-108. On June 27, 2008, Chase issued Plaintiff a counseling memorandum which memorialized the items discussed at the meeting:

> On June 19, 2008, you met with Frank Russo and me for the purpose of discussing your role as supervisor of the district maintenance staff. At that meeting, I told you that as a head maintainer for the district (Civil Service title of Maintenance Supervisor I) you are responsible for supervising and directing the work of the entire district maintenance staff in all aspects of their work.
>
> Despite nearly thirty years in the district, and twenty in your current position, during our conversation you stated that you did not have the expertise in the areas of construction and remodeling to adequately supervise the staff in these areas. You also stated that your area of specialty was heating and ventilation, and that you did not have confidence in directing other activities.

> I enclose a copy of your Civil Service job description with this memo.  I call your attention to the General Statement of Duties, which states "*Under general supervision, assigns and directs subordinate employees in a wide variety of maintenance and repair tasks; performs related duties as required*".  In addition, under the hearing of Typical Duties, item # 4 states "*Acts as a working supervisor and performs a wide variety of skilled and semi-skilled tasks*".
>
> You are expected to comply with the duties of your job as detailed in this job description, and to actively and skillfully supervise the maintenance staff in each of the duties that they are expected to perform.  If you are unable or unwilling to comply with this directive, you will be deemed insubordinate and subject to disciplinary action.

*See* Holtzer Decl., Ex. I (emphasis in original).  Chase testified that the foregoing memo was not a form of discipline.  *See* Def.'s Rule 56.1 Stat. ¶ 112.  Plaintiff himself testified that a negative letter in his personnel file constituted a form of discipline only "[t]o a minimal degree."  *Id*. ¶ 113 (citing Pl.'s Dep. at 41).  According to Chase, Plaintiff would improve his performance following the June 2008 meeting.  *Id*. ¶ 114.  As such, Chase was not contemplating bringing disciplinary action against Plaintiff at the time of the meeting.  *Id*. ¶ 116.  If Plaintiff was disciplined, as a union employee, Plaintiff would be entitled to the grievance procedures set forth in the collective bargaining agreement ("CBA") and have the opportunity to challenge any such action before a neutral arbitrator.  *Id*. ¶¶ 117-118 (citing Collective Bargaining Agreement between District's Board of Education and Civil Service Employees Association, annexed to the Holtzer Decl. as Ex. N, at 19-20).

Plaintiff contends that Defendant's failure to point to a single incident where his "alleged lack of experience" impacted the completion of a carpentry or construction project belies Defendant's claims about his supervisory performance.  *See* Pl.'s Rule 56.1 Stat. ¶¶ 108.1 –

108.4.  According to the Plaintiff, the counseling memo does not accurately represent what occurred at the June 2008 meeting.  Plaintiff maintains that Defendant could not point to a single instance where his lack of supervisory skills adversely impacted the completion of a job.  Pl.'s Rule 56.1 Stat. ¶ 110.3.  Moreover, Plaintiff again submits that, despite the criticism of his performance by Defendant, he was never transferred nor terminated during his tenure with the District.  *Id.* 110.4.

Furthermore, Plaintiff disputes Defendant's contention that a counseling memo is not a form of discipline.  Pl.'s Rule 56.1 Stat. ¶ 112.  According to the Plaintiff, a "negative letter is a form of discipline" and that "[i]f someone is written up with a negative letter, the administration decides what further punishment or actions are necessary."  *Id.* ¶¶ 112-112.1.  Plaintiff testified that Chase told him that he would be demoted and then proceeded to tell Plaintiff to "[g]et out of my office."  *Id.* ¶ 116.1 (citing Pl.'s Dep. at 90-91, 170).  Chase told Plaintiff that he would be demoted as soon as Plaintiff mentioned that he intended to retire at age 65.  *Id.* ¶ 116.2.  In his Counterstatement, Plaintiff explains that both Russo and Chase contemplated taking away Plaintiff's supervisory responsibilities at the time of the June 2008 meeting.  *Id.* ¶ 116.3.  Chase copied the Superintendent, Dr. Fierson, on the June 2008 counseling memo and discussed the circumstances surrounding the meeting.  *Id.* ¶¶ 116.3 – 116.6.  Notably, Plaintiff does not dispute the grievance procedures that he was entitled to use under the CBA in the event that he was subjected to disciplinary action.  *Id.* ¶¶ 117-118.

### 5. *The Elmer Lopez Incident*

In July 2008, Plaintiff complained to Russo that one of his subordinates, Elmer Lopez, failed to report to his assignment on the morning of July 2, 2008 and when Plaintiff raised the

issue, Lopez told Plaintiff to "go fuck himself." *See* Def.'s Rule 56.1 Stat. ¶ 119. Plaintiff wrote a memo addressed to Lopez, Russo, and Chase which memorialized the incident. *Id.* ¶ 120 (citing July 7, 2008 Memorandum from Plaintiff to Elmer Lopez, Frank Russo, and Al Chase, annexed to the Holtzer Decl. as Ex. P). Plaintiff testified that he delivered his "write-up" of Lopez to Chase's office as well as to union president, Pat Dino. *Id.* ¶ 121.

Defendant states that Russo investigated Plaintiff's complaint about Lopez; however, Plaintiff contends that Russo simply met with Lopez and the encounter was never described as an "investigation" by Russo. *See* Def.'s Rule 56.1 Stat. ¶ 123; *see also* Pl.'s Rule 56.1 Stat. ¶ 123. According to the District, Lopez told Russo that Plaintiff was first to curse and that Lopez "simply responded in kind." *Id.* ¶ 124. However, Plaintiff submits that "to the extent that [Plaintiff] cursed at Lopez first, [Plaintiff] never cursed at Lopez during the incident. Pl.'s Rule 56.1 Stat. ¶ 124. Lopez advised Russo that he refused to apologize to Plaintiff because he did not receive an apology from Plaintiff. *See* Def.'s Rule 56.1 Stat. ¶ 125. According to Plaintiff, Lopez told Russo that he felt as if he was "picked on" by Plaintiff for being Latin. *See* Def.'s Rule 56.1 Stat. ¶ 126 (citing Pl.'s Dep. at 190); see also Pl.'s Rule 56.1 Stat. ¶ 12.

Russo spoke with another maintenance worker, Enzo Memone, about the incident between Plaintiff and Lopez. *See* Def.'s Rule 56.1 Stat. ¶ 127. According to Russo's testimony, Memone witnessed the incident and confirmed that Plaintiff cursed at Lopez first. *Id.* ¶ 128 (citing Russo Dep. at 61). Defendant states that Memone advised Russo that Plaintiff cursed at Lopez first and that Lopez responded "in kind, corroborating Lopez's version of events." *Id.* ¶ 129. Russo testified that he did not pursue the matter any further because it was an issue of "one person saying one thing and another saying another thing." *Id.* ¶ 130. Plaintiff disputes this

version of events and adds that a subordinate who curses at a supervisor "should be punished regardless of the circumstances." *See* Pl.'s Rule 56.1 Stat. ¶ 130.1.

### 6. *Plaintiff's Retirement*

In or about 2008, Plaintiff's union, the Civil Service Employees Association ("CSEA"), requested a retirement incentive from the District for its members in connection with the negotiation of a CBA. *See* Def.'s Rule 56.1 Stat. ¶ 131. Under the terms of the proposal, members who retired by October 13, 2008 would be entitled to an "enhanced health benefit." *Id.* ¶ 132. The District's Board of Education agreed to the proposed retirement incentive. *Id.* ¶ 133. In or around June 2008, Plaintiff became aware of the incentive. *Id.* ¶ 134. Plaintiff understood that under the retirement incentive, the District would pay the entire cost of his health insurance. *Id.* ¶ 135. Defendant advised Russo that he did not want to pay for medical insurance. *Id.* ¶ 136. However, Plaintiff maintains that he stated he was "not going to pay into medical." Pl.'s Rule 56.1 Stat. ¶ 136.

On September 2, 2008, Plaintiff notified Defendant of his intention to retire in a memorandum addressed to Assistant Superintendent Chase. *See* Def.'s Rule 56.1 Stat. ¶ 137; *see also* September 2, 2008 Memorandum from Plaintiff to Al Chase, annexed to the Holtzer Decl. as Ex. K. The memorandum stated:

> I am retiring from the Garden City Public Schools as of October 13, 2008. I am taking the health benefits option package where I do not pay anything for single coverage.
>
> I will be purchasing the major medical supplementary.

*See* Holtzer Decl., Ex. K; *see also* Def.'s Rule 56.1 Stat. ¶ 138. In his Counterstatement, Plaintiff disputes that he "wished to take advantage of the incentive" and notes that, "before the

harassment began, [he] wanted to continue working until he was 65." *See* Pl.'s Rule 56.1 Stat. ¶¶ 138, 138.1 (citing Pl.'s Dep. at 92). Plaintiff states further that his pension would have been 5% higher if he were able to retire at age 65. *Id.* ¶ 138.2. Moreover, Plaintiff submits that he told his union representative, Vice President Judy Weiss, that he disliked the "idea of this incentive with the union with retirement with the medical." *Id.* ¶ 138.3 (citing Pl.'s Dep at. 228). Plaintiff notes that he told a "union trouble shooter" in a July 2008 meeting that "[t]hey're pushing me out of here. That's age discrimination" *Id.* ¶ 138.4. Plaintiff claims that Pat Dino was also present at the July 2008 meeting and overheard Plaintiff's comments. *Id.* Likewise, Plaintiff maintains that he also complained about "being forced out due to his age" to union secretary Helen Philmus as well as Head Custodian John Bentz. *Id.* ¶¶ 138.5 – 138.6.

Plaintiff does not dispute that he did not mention anything about harassment or discrimination in his retirement letter. *See* Def.'s Rule 56.1 Stat. ¶ 139 (citing Holtzer Decl., Ex. K). Plaintiff was aware that Russo would no longer be working for Defendant in July or August 2008. *Id.* ¶ 140. Moreover, at the time Plaintiff submitted his September 2, 2008 retirement letter, Plaintiff was already aware that Russo was leaving the district. *Id.* ¶ 141. Plaintiff, in fact, chose the last possible date that he could retire from employment with Defendant and still be entitled to the retirement incentive, namely, October 13, 2008. *Id.* ¶¶ 142-143. Despite Plaintiff's ability to retire prior to October 13, 2008, Plaintiff chose to remain employed. *Id.* ¶ 144. Moreover, the parties agree that the District never told Plaintiff that he would be terminated if he refused to retire. *Id.* ¶ 145. Additionally, Plaintiff concedes that Chase did not discriminate against him on the basis of his religion. *Id.* ¶ 146.

Plaintiff claims that he was discriminated against on the basis of his age and, consequently, was compelled into retirement. Upon his return from jury duty on June 10, 2008, Plaintiff discovered a note from Russo on his desk advising him that Dr. Fierson's air conditioner was not working. *See* Def.'s Rule 56.1 Stat. ¶ 147. Plaintiff claims that he was told to fix it "ASAP" and to have his workers trained in air conditioning. *Id.* In his opposition, Plaintiff disputes the District's characterization of his claims of age discrimination, noting that Chase wanted Plaintiff's subordinates - - not Plaintiff - - trained in air conditioning so that Defendant could send Plaintiff "out the door for [his] age." *See* Pl.'s Rule 56.1 Stat. ¶ 147 (citing Pl.'s Dep. at 232). Plaintiff states that "when much younger employees lack skill in an area, they are offered training, while when [Plaintiff] allegedly lacked skill in an area, he was threatened with a demotion and forced into retirement." *Id.* ¶ 147.1. Plaintiff notes that, tellingly, the letter from Chase regarding the June 19, 2008 meeting references Plaintiff's "long tenure with the district, over 30 years, using it as a proxy for his age." *Id.* ¶ 147.3. According to the Plaintiff, Chase was proud of his ability to "get older employees to retire, and bragged about it to Dr. Fierson, who supported this behavior." *Id.* ¶ 147.4. Chase was purportedly heard saying to Dr. Fierson that "I got another one to retire." *Id.* ¶ 147.6. Plaintiff also claims that Pete Mendoza asked him why he did not retire. *Id.* ¶ 147.7. Additionally, Plaintiff testified that he was replaced in his role of Maintenance Supervisor I by Harold Turner, who is 15 years younger than Plaintiff and not Jewish. *Id.* ¶ 147.8.

Whereas Defendant states that its employees never made comments about Plaintiff's age, Plaintiff disagrees. *See* Def.'s Rule 56.1 Stat. ¶ 148. Plaintiff states that Chase demonstrated his animus against Plaintiff's age by engaging in the behavior described above. *See* Pl.'s Rule 56.1

Stat. ¶¶ 148 – 148.3. Plaintiff, however, concedes that Russo was "only a year or year and a half younger than" Plaintiff. *See* Def.'s Rule 56.1 Stat. ¶ 149. Plaintiff never spoke directly with Dr. Fierson. *Id*. ¶ 151. However, Plaintiff asserts that Dr. Fierson was "involved in the retirement incentive" which was used to compel Plaintiff and other older workers into retirement to save the District money. *See* Pl.'s Rule 56.1 Stat. ¶ 152.

The remaining facts are not in dispute. Plaintiff could not identify one individual employed by Defendant who had created a hostile work environment for him at the time he submitted his September 2008 retirement letter. *See* Def.'s Rule 56.1 Stat. ¶ 153. Moreover, although Plaintiff filed administrative complaints against the District in September 2009 in both the New York State Division of Human Rights and the Nassau County Commission on Human Rights, neither complaint alleges discrimination on the basis of Plaintiff's religion, Russo's alleged comments concerning Jews, or Chase's "threat" to demote Plaintiff. *Id*. ¶¶ 154-157. Finally, Plaintiff concedes that he never complained to Assistant Superintendent Chase about discrimination or harassment. *Id*. ¶ 160.

### E. Plaintiff's Additional Alleged Material Facts

In addition to his Rule 56.1 counterstatement, Plaintiff has set forth "additional material facts as to which it is contended that there exists a genuine issue to be tried." *See* Local Rule 56.1(b). A majority of the paragraphs set forth in Plaintiff's "additional material facts" refer to the Affidavit of Victor Weinstein in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Aff."). *See* DE 21. In his narrative of additional facts, Plaintiff asserts that "[a]t all times during his employment with the Garden City Union Free School District ('District')[,] Plaintiff was fully capable and qualified to supervise any and all construction projects that he was asked

to complete." *See* Pl.'s Rule 56.1 Stat. ¶ 168 (citing Pl.'s Aff. ¶ 2). Plaintiff adds that the

District "created working conditions which were too intolerable for [Plaintiff] to continue his

employment." *Id.* ¶ 171 (citing Pl.'s Aff. ¶ 5). Defendant "engaged in a campaign" to compel

Plaintiff into retirement, noting that Plaintiff was "threatened with demotion" right after he

explained to Chase that he wished to work until 65. *Id.* ¶ 173 (citing Pl.'s Aff. ¶¶ 6-7). Plaintiff

claims that he was given a "poor evaluation" for the first time in his career in 2008. *Id.* ¶ 174

(citing Pl.'s Aff. ¶ 8). However, Plaintiff has not disclosed the referenced evaluation in

discovery or in his opposition.

Additionally, Plaintiff states in his Rule 56.1 Statement that in 2008, an unnamed

"District secretary" in her early 60s was "forced to retire due to her advanced age." *See* Pl.'s

Rule 56.1 Stat. ¶ 181 (citing Pl.'s Aff. ¶ 15). According to the Plaintiff, the District was

"constantly transferring her between schools in an effort to make her working conditions so

unbearable that she would be forced to retire," which she did in 2008. *Id.*

## III.   PROCEDURAL HISTORY

On April, 28, 2011, Plaintiff filed a Complaint against the District in the Supreme Court

of the State of New York, Nassau County. *See* Compl. [DE 1]. On May 16, 2011, Defendant

filed a Notice of Removal of the state action to the federal court on the basis of federal question

jurisdiction. *See* Notice of Removal [DE 1]; 28 U.S.C. § 1331 and § 1441(b). The Complaint

was removed and filed in this Court on May 25, 2011. *See* Notice of Removal. In his

Complaint, Plaintiff has set forth two causes of action against the Defendant under 42 U.S.C.

§ 1983 for employment discrimination on the basis of his religion and age in violation of the

Equal Protection Clause of the Fourteenth Amendment. *See* Compl. ¶ 42.

22

On June 13, 2011, the District filed its Answer to the Complaint. *See* DE 5. The parties consented on March 12, 2012 to the jurisdiction of a United States Magistrate Judge to "conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings." *See* DE 9. On March 13, 2012, the District Judge assigned to this matter "so ordered" the consent and this action was referred to the undersigned in accordance with 28 U.S.C. § 636(c) and FED R. CIV. P. 73. *See* DE 10.

On July 13, 2012, the District filed its Motion for Summary Judgment, Rule 56.1 Statement of Undisputed Material Facts, and an Affidavit by Albert Chase, Assistant Superintendent for Business, in Support of the Motion for Summary Judgment. *See* DE 16. Plaintiff filed his Rule 56.1 Counterstatement, Memorandum in Opposition to Defendant's Motion for Summary Judgment, and an Affidavit of Plaintiff himself in Opposition to Defendant's Motion for Summary Judgment on September 13, 2012. *See* DE 19-21. On October 11, 2012, the District filed its Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment. *See* DE 17.

## IV.   STANDARD OF REVIEW

FED. R. CIV. P. 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all

factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09 Civ. 5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06 Civ. 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

With respect to employment discrimination cases, the Second Circuit has advised that trial courts should "be cautious about granting summary judgment to an employer when . . . its intent is in issue," and that "affidavits and depositions must be carefully scrutinized for circumstantial

proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994); *see Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). Summary judgment is, however, "appropriate even in discrimination cases for . . . 'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to . . . discrimination cases than to other areas of litigation.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1995)); *Potash v. Florida Union Free School Dist.*, --- F. Supp. 2d ---, 2013 WL 5273792, at *12 (S.D.N.Y. Sept. 18, 2013).

## V. DISCUSSION

With the foregoing principles in mind, the Court now turns to each of Plaintiff's causes of action.

### A. Municipal Liability

"'Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law.'" *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10 Civ. 5612, 2012 WL 3646935, at *22 (E.D.N.Y. Aug. 22, 2012) (citing *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999)). It is well-settled that municipal entities, including schools district such as Defendant, are "persons" within the meaning of § 1983 and are therefore subject to suit under the statute. *See Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (citing *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 663 (1978); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004)). However, municipalities are not liable under a theory of *respondeat superior* solely on account of a municipal employee's commission of a tort.

*Id.* (citing *Monell*, 436 U.S. at 691).  Indeed, "Section 1983 'distinguish[es] acts of the *municipality* from acts of *employees* of the municipality,' and imposes liability only for 'action for which the municipality is actually responsible.'"  *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis in original).

To state a claim for municipal liability, a plaintiff must show (1) a violation of his constitutional rights, and (2) that the violation was caused by a municipal policy or custom.  *See Sheikh v. City of New York*, 03 Civ. 6326, 2008 WL 5146645, at *11 (E.D.N.Y. Dec. 5, 2008) (citing *Monell*, 436 U.S. at 690-91); *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 400 (1997) (the policy or custom must be the actual "moving force" behind the alleged wrong). "It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official."  *Levy v. Alfano*, 47 F.Supp.2d 488, 498 (S.D.N.Y. 1999).

To establish a municipal policy or custom, a plaintiff must establish one of the following elements:  (1) a formal policy, promulgated or adopted by Defendants; (2) that an official with policy making authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials was so permanent or well settled so as to constitute a "custom or usage" and that the practice was so widespread as to imply the constructive acquiescence of policy-making officials. *Sheikh*, 2008 WL 5146645, at *11 (internal citations omitted).  Accordingly, a municipality cannot be held liable under § 1983 by application of *respondeat superior*.  *See, e.g., Rubio v. County of Suffolk*, No. 01 Civ. 1806, 2007 WL 2993833, at *2 (E.D.N.Y. Oct. 8, 2007) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1968)).

Rather, Plaintiff must show that "through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir. 2008) (citing *Bd. Of County Comm'rs v. Brown*, 520 U.S.. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

Plaintiff contends that there is an issue of fact whether the District can be held liable for violating his constitutional rights under § 1983. *See* Pl.'s Mem. at 24. In support of this assertion, Plaintiff claims that the Defendant's discriminatory practices were so "persistent and widespread" that they were "analogous to the force of law" even though not "authorized written law or express municipal policy." *Id.* As such, Plaintiff maintains that the persistence of the District's widespread discriminatory practices renders action by even subordinate officials tantamount to "municipal policy." *Id.* at 25. Specifically, Plaintiff argues, in conclusory fashion, that the "pattern of harassment" was "permanent and well-settled" and that "some of the highest officials" (*i.e.*, Assistant Superintendent Chase and Director Russo) employed by the District were committing "hostile acts" against him. *Id.* In furtherance of this argument, Plaintiff submits that (1) Chase and Russo's actions were approved by Superintendent Fierson; (2) Assistant Superintendent Chase "bragged about his ability to get older employees to retire;" and (3) complaints to union representatives "were not taken seriously." *Id.*

The Court finds that Plaintiff has failed to establish municipal liability under *Monell*. As an initial matter, "[b]oilerplate assertions that a municipality has a custom or policy resulting in a constitutional deprivation of the plaintiff's rights are insufficient" to make out a *Monell* claim. *Bohmer v. New York*, No. 06 Civ. 11370, 2011 WL 2651872, at *3 (S.D.N.Y.) (citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman v.*

*Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)).  The District correctly notes that the only "policy" referenced here by the Plaintiff, even remotely, is the Board of Education's non-discrimination policy, which, in any case, Plaintiff does not contend was implemented in a manner that violated his constitutional rights.  *See* Def.'s Mem. at 5; *see also* District's Equal Opportunity Policy, annexed to the Holtzer Decl. as Ex. F.

       To the extent that Plaintiff argues that Director Russo's two alleged remarks about Jews in 2007 establish *Monell* liability, such a claim necessarily fails.  Courts will not find an underlying constitutional violation solely on the basis of verbal harassment.  *Curcio*, 2012 WL 3646935, at *18; *Haussman v. Fergus*, 894 F. Supp. 142, 149 n. 20 (S.D.N.Y. 1995); *Cole v. Fisher*, 379 Fed. App'x 40, 43 (2d Cir. 2010).  In *Curcio*, the court held that defendants were not liable under Section 1983 because Plaintiff failed to identify any underlying constitutional violation by municipal officials and that "verbal harassment, standing alone, does not amount to a constitutional deprivation."  *See Curcio*, 2012 WL 3646935, at *18; *see also Haussman*, 894 F. Supp. at 149 n. 20 ("Offensive racial comments cannot form the basis of a 1983 claim.").  Here, Plaintiff does not dispute that Russo made no more than two alleged derogatory comments about Jews in Plaintiff's presence in 2007.  *See* Def.'s 56.1 ¶ 67.  These remarks, standing alone, do not create a basis for *Monell* liability as a matter of law.  Significantly, these comments occurred more than a year prior to Plaintiff's purported "forced retirement."  The timing is important.  As one court has noted, the analysis is "not based upon a rigid characterization of the comment as 'stray' or 'not stray,' but rather [is] consistent with the Second Circuit's guidance that 'the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'"  *Greene v. Brentwood Union Free*

*School Dist.*, --- F. Supp. 2d ---, 2013 WL 4432357, at *3 (E.D.N.Y. Aug. 13, 2013) (quoting

*Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)), *abrogated in part on*

*other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).  In addition, even

Defendant's alleged "failure to 'put an end' to [Director Russo's] comments is no basis for

liability under Section 1983."  *Curcio*, 2012 WL 3646935.

　　　　Moreover, neither of the individuals whom Plaintiff claims discriminated against him,

namely, Russo and Chase, possessed any "final policymaking authority" over any of the actions

challenged by Plaintiff.  *See* Def.'s Mem. at 5.  Under Second Circuit case law, the "official in

question need not be a municipal policymaker for all purposes," but rather "must be responsible

under state law for making policy "*in that area* of the [municipality's] business."  There is no

issue of material fact that these individuals were not authorized to demote or terminate

employees, much less set policy for the District.  *Id*. at 6.  That authority rests with the Board of

Education.  *Id*.  Defendant's organizational hierarchy reflects that neither of these individuals

could supersede the policymaking authority of the Board of Education.  *Id*.

　　　　The powers and duties of a Board of Education are set forth in New York Education Law

§ 1709.  Among other powers and duties, a school district's Board has the authority to

> operate the facilities provided . . . .
>
> have in all respects the superintendence, management and control
> of said union free schools . . . .
>
> contract with . . . and employ such persons as may be necessary to
> supervise, organize, conduct and maintain athletic, playground and
> social center activities . . . .
>
> have in all respects the superintendence, management and control
> of the educational affairs of the district, and, therefore, shall have
> the powers reasonably necessary to exercise powers granted

> expressly or by implication and to discharge duties imposed
> expressed or by implication by this chapter or other statutes.

N.Y. EDUC. LAW § 1709(6), (13), (16), (33). Accordingly, as correctly noted by Defendant, "not only does the Board have final policymaking authority for personnel decisions, it has final policymaking authority with respect to matters that are ultimately carried out through the Assistant Superintendent for Business and the Director of Facilities, such as maintenance, janitorial responsibilities, and facility purchasing decisions." *See* Def.'s Mem. at 6-7.

Plaintiff's opposition does not address Russo or Chase's lack of policymaking authority and merely concludes that they represented some of the "highest officials within the Garden City School District." Pl.'s Mem. at 25. Russo reported to Chase, who, in turn, reported to the Superintendent. Def.'s Rule 56.1 Stat. ¶ 17. Even the Superintendent must first make a recommendation to the Board of Education, which has the ultimate vote on any proposed disciplinary action regarding an employee. *Id.* ¶ 19. Plaintiff has not refuted this fact. The Board of Education appoints superintendents who are delegated with the powers of "supervision and direction of…assistant and other superintendents, directors… janitors and other persons employed in the management of the schools or the other educational activities of the district." N.Y. EDUC. LAW § 1711. Thus, even the personnel decisions and actions of the Superintendent constitute mere recommendations that must ultimately be adopted by the final policymaking body, the Board of Education. *See id.* Nowhere in the Education Law are assistant superintendents or directors authorized with any specific authority. *See id.*

As further evidence of the policymaking authority reserved to the Board of Education, Defendant has annexed to its motion a Board Policy Development provision. *See* Board Policy Development, annexed to the Holtzer Decl. as Ex. O. The provision states that "[t]he proposal of

new policies shall initially be presented to the Superintendent of Schools, who will submit the proposed policy to the full Board as an item for evaluation and comment." *Id*. The Board of Education is responsible for all personnel actions and, upon the recommendation of the Superintendent, votes on all disciplinary actions. Chase Aff. ¶ 3.

Notwithstanding these provisions, Plaintiff claims that Superintendent Fierson "approved" the "hostile acts" committed against Plaintiff. *See* Pl.'s Mem. at 25. However, the Court notes that the only specific allegation made against Superintendent Fierson is that he wanted his broken air conditioner repaired. Pl.'s Dep. at 231-32. Plaintiff testified that:

> Q.    How does jury duty relate to age discrimination?
>
> A.    When I came back June 10th from jury duty, there was a note on my desk from Mr. Russo saying that Dr. Feirsen's [*sic*] air conditioner was not working. Fix it ASAP and then he wants the men training in air conditioning.
>
>       So looking back in hindsight, if I lacked any skills or somewhat skills, why did he want them training for air conditioning and he wouldn't offer me any training. Obviously, he had me out the door because of my age.

Pl.'s Dep. at 231-32. Plaintiff's conclusion here with regard to the Superintendent is pure speculation. There is no indication that Superintendent Fierson acted with any discriminatory animus towards Plaintiff. Even if such an animus existed, Superintendent Fierson lacks any policymaking authority that would warrant relief. Accordingly, none of the individuals and circumstances identified by Plaintiff establish *Monell* liability.

Plaintiff's remaining arguments concerning his *Monell* claim are similarly defective. Whether or not the complaints of discrimination Plaintiff allegedly communicated to his union

were "taken seriously" has little bearing here.  *See* Pl.'s Mem. at 25.  Plaintiff's union has not

been named in this action and is not the subject of the allegations at issue.  Secondly, Plaintiff's

claim that the District failed to take action with respect to workplace discrimination complaints is

both conclusory and lacking a factual basis.  The claim fails because Plaintiff has not set forth

any evidence that the alleged actions were taken on account of an official policy, adopted by

policymaking officials, or so "well-settled" in the district that policymaking officials

constructively acquiesced to such alleged practices.  *Sheikh*, 2008 WL 5146645, at *11.

Finally, Plaintiff's hearsay statement about an unnamed "District secretary" in her early

60s who was allegedly "forced to retire due to her advanced age" does not create a triable issue

of fact whether there was a custom or policy of discriminating against older workers in the

District.  *See* Pl.'s Rule 56.1 Stat. ¶ 181 (citing Pl.'s Aff. ¶ 15).  The Court notes that

"[a]ffidavits submitted in support of or in opposition to the summary judgment motion must "be

made on personal knowledge, shall set forth such facts as would be admissible in evidence, and

shall show affirmatively that the affiant is competent to testify to the matters stated therein."

*Patterson*, 375 F.3d at 219 (internal citations and quotations omitted).  Under Federal Rule 56(e),

the "requirement that the affiant have personal knowledge and be competent to testify to the

matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be

admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."

*Id*.  Consequently, Plaintiff's *Monell* claims are dismissed.

**B.**        **Statute of Limitations**

The statute of limitations for claims brought pursuant to 42 U.S.C. § 1983 depends on the

law of the state in which the claims are brought.  *See, e.g., Feliciano v. County of Suffolk*, No. 04

Civ. 5321, 2013 WL 1310399, at *6 (E.D.N.Y. Mar. 28, 2013). For cases brought in New York, the statute of limitations is three years. *Id.* (citing *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Fahs Constr. Group v. Gray*, No. 13-27, 2013 WL 4017043, at *2 (2d Cir. 2013); *Harmon v. Patrolman's Benev. Ass'n of City of New York (PBA)*, 199 Fed.Appx. 46, 48 (2d Cir. 2006). A Section 1983 claim accrues when a plaintiff knows or should have known of the disparate treatment. *Fahs*, 2013 WL 4017043, at *2. However, if a plaintiff challenges a "continuous practice and policy of discrimination," the statute of limitations period does not commence until the "last discriminatory act in furtherance of it." *Id.* Under Second Circuit case law, "[t]o trigger such a delay, the plaintiff 'must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy.'" *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)).

Here, several of Plaintiff's claims are time-barred. Plaintiff commenced the instant action on April 28, 2011. *See generally* Compl. Thus, any claim arising before April 28, 2008 would be barred by the statute of limitations. With respect to Plaintiff's claim of religious discrimination, the parties do not dispute that both of Russo's alleged remarks concerning Jews were made in 2007. *See* Def.'s Rule 56.1 Stat. ¶ 67; *see also* Compl. ¶¶ 20-21. Additionally, Plaintiff states that Russo failed to include him in the decision to hire maintenance worker William Kennedy in September 2007. *See* Def.'s Rule 56.1 Stat. ¶ 36. Accordingly, since the foregoing events pre-date April 8, 2008, the Court dismisses these claims in their entirety.

Nor does Plaintiff make out a successful case for a continuing violation. Relying on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002), Plaintiff argues that his hostile work environment claim is timely. In *Morgan*, the Supreme Court held that where

some of the component acts of the hostile work environment claim fall outside the statutory time period, where an "act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for purposes of determining liability." *Id.* at 117. Plaintiff's reliance on *Morgan* is misplaced, however, as none of the claims set forth in Plaintiff's hostile work environment claim fall within the three-year limitations period. "As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor." *De La PeÑa v. Metro. Life Ins. Co.*, No. 12 Civ. 766, 2013 WL 3488510, at *11 (E.D.N.Y. July 11, 2013) (internal citation and quotation omitted); *Stamm v. New York City Transit Auth.*, 04 Civ. 2163, 2013 WL 244793, at *8 (E.D.N.Y. Jan. 22, 2013). Thus, only "compelling circumstances will warrant the application of the exception to the statute of limitations." *De La PeÑa*, 2013 WL 3488510, at *11. "Although discrete incidents of discrimination that are not the result of a discriminatory policy or practice will not ordinarily amount to a continuing violation, where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice, a continuing violation may be found." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996) (internal citations and quotations omitted). That is not the case with the Plaintiff's claims.

Here, the 2008 allegations cited by Plaintiff are unrelated to the two discriminatory remarks Russo is alleged to have made in 2007. *See* Pl.'s Mem. at 5. Plaintiff's 2008 allegations ("baseless disciplinary action," "threatened with demotion," refusal by Defendant to discipline Lopez, receiving a negative evaluation, and being forced to retire) are all unconnected to the two discrete comments made by Russo in 2007. *Id.* at 5-6. The foregoing discrete and unrelated

actions consequently do not, as a matter of law, amount to a continuing violation. *See Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").

Plaintiff's claims are not unlike those of the plaintiff in *Van Zant*, 80 F.3d at 712-713, where the Second Circuit declined to apply the continuing violation doctrine on the basis that, similar to the instant action, there was no connection established between the alleged harassment and the discrete employment actions taken within the limitations period. Moreover, "[t]he mere continuation of plaintiff's employment" into the limitations period is insufficient to render Plaintiff's pre-April 8, 2008 claims timely. *See Harris*, 186 F.2d at 250.

Alternatively, Plaintiff argues that under *United Airlines, Inc. v. Evans*, 431 U.S. 553 (1977), he can present evidence of Russo's time-barred 2007 remarks as "relevant background evidence." *See* Pl.'s Mem at 6. Plaintiff argues that under *Evans*, he can present "evidence of prior discrimination regarding termination, although untimely." *Id.* Plaintiff further asserts that "even if the discriminatory comments made by Russo would not be actionable on their own, the comments are relevant to prove Russo's discriminatory state of mind at the time he engaged in conduct which is timely. *Id.* Plaintiff is mistaken. In *Evans*, the Supreme Court held that untimely allegations may be considered as "relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *Evans*, 431 U.S. at 558. Here, the two discrete comments allegedly made by Russo in 2007 do not constitute a "current practice" which is "at issue." It is undisputed that bigoted remarks based on religion are not a

35

"current practice" during the limitations period. Accordingly, all of Plaintiff's claims pre-dating

April 8, 2008 are dismissed based on the statute of limitations.

####    C.        Section 1983 Equal Protection Claim

#####        *1. Employment Discrimination Framework*

A Section 1983 claim may be predicated on age or religion as well as other protected

classes so long as the claim is "based on a distinct violation of a constitutional right," such as the

Equal Protection Clause of the Fourteenth Amendment. *See Gierlinger v. New York State*

*Police*, 15 F.3d 32, 35 (2d Cir. 1994); s*ee also Thomas v. New York City Dep't of Educ.*, No. 10

Civ. 464, 2013 WL 1346258, at *12 (S.D.N.Y. Mar. 29, 2013) ("A plaintiff can bring an equal

protection claim based on age discrimination, but cannot use violations of employment

discrimination statutes as the basis for a §1983 claim") (*citing Patterson v. County of Oneida*,

375 F.3d 206, 225 (2d Cir. 2004)). "A § 1983 action may not, however, be brought to vindicate

rights conferred only by a statute that contains its own structure for private enforcement, such as

Title VII." *See Patterson*, 375 F.2d at 225 (citing *Saulpaugh v. Monroe Community Hospital*, 4

F.3d 134, 143 (2d Cir. 1993)).[3]

---

[3]        Although the issue of whether the Age Discrimination in Employment Act ("ADEA") of 1967 preempts a section 1983 equal protection claim based on age is currently before the Supreme Court in *Madigan v. Levin* (reviewing *Levin v. Madigan*, 692 F.3d 607 (7th Cir. 2012)), the Court notes that governing case law in the Second Circuit overwhelmingly holds that such claims are cognizable. *See Butts v. NYC Dep't of Hous. Pres. and Dev.*, 307 Fed. Appx. 596, 598, n.1 (2d Cir. 2009)(Court unaware of any prior Second Circuit opinions addressing whether ADEA preempts age discrimination claims based on violation of Equal Protection clause and declining to address the issue); *Pappas v. New York City Bd. of Educ.*, No. 07 Civ. 4312, 2011 WL 128509, at *1 (E.D.N.Y. Jan. 14, 2011)(reviewing cases and finding no preclusion); *Fusaro v. Murphy*, No. 08 Civ. 1234, 2011 WL 4572028 (D. Conn. Sept. 30, 2011); *Shapiro v. New York City Bd. of Educ.*, 561 F. Supp. 2d 413 (S.D.N.Y. 2008); *Purdy v. Town of Greenburgh*, 166 F. Supp. 2d 850, 867-68 (E.D.N.Y. 2001).

Claims brought under Section 1983 are assessed under the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817 (1973). *See Blythe v. City of New York*, No. 08 Civ. 2843, 2013 WL 3990772, at *8 (E.D.N.Y. Aug. 5, 2013) (holding that *McDonnell-Douglas* burden-shifting analysis applies to a Section 1983 claim); *see also Apicella v. Rite Aid Hdqtrs. Corp.*, No. 10 Civ. 1679, 2013 WL 1281560, at *3 (E.D.N.Y. Mar. 27, 2013) (same)*; Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 7 (2d Cir. 1989) (same); *Piccone v. Town of Webster*, 511 Fed. Appx. 63 (2d Cir. 2013) (same). Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock*, 224 F.3d at 42. Furthermore, "the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minimis." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001) (internal citation and quotations omitted).

Once the plaintiff has established a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Weinstock*, 224 F.3d at 42. "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742 (1993) (internal quotation marks omitted; emphasis in original); *Aboeid v. Saudi Arabian Airlines Corp.*, No. 10 Civ. 2518, 2013 WL 3340475, at *14 (E.D.N.Y. July 2, 2013). "Upon the defendant's articulation of such a non-

discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." *Weinstock*, 224 F.3d at 42; *Sibilla v. Follett Corp.*, No. 10 Civ. 1457, 2012 WL 1077655, at *5 (E.D.N.Y. Mar. 30, 2012). In order for the case to continue, the plaintiff must come forward with evidence that the defendant's proffered, non-discriminatory reason is a pretext for actual discrimination. *Weinstock*, 224 F.3d at 42. The plaintiff must demonstrate by a preponderance of the evidence that the articulated reason is untrue *and* that discrimination was the real reason for the employment action taken. *Id*. With these principles in mind, the Court now turns to the fact-specific circumstances of the instant case.

### 2. Disparate Treatment

### a. Prima Facie Case

In the instant action, the parties do not dispute that Plaintiff is a member of a protected class insofar as Plaintiff seeks relief on the basis of his age and religion (Jewish). *See* Compl. ¶ 42; *see also* Def.'s Mem. at 10. The parties similarly do not dispute whether Plaintiff was qualified for the position. *See* Def.'s Mem. at 10. However, the parties do dispute whether Plaintiff has established the remaining elements of a *prima facie* claim, namely: (1) whether Plaintiff suffered an adverse employment action, and (2) whether Plaintiff did so under circumstances giving rise to an inference of discrimination. *See id*.; Pl.'s Mem. at 8-12.

In general, an "adverse employment action" is defined by a "materially adverse change in the terms and conditions of employment," and something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rozenfeld v. Dep't of Design & Constr.*, 875 F. Supp. 2d 189, 203-205 (E.D.N.Y. 2012) (citing *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.

2006)). "Employment actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Humphrey v. County of Nassau*, No. 06 Civ. 3682, 2009 WL 875534, at *5 (E.D.N.Y. Mar. 30, 2009) (internal citation and quotations omitted). However, there is "no exhaustive list of what constitutes an adverse employment action" as courts have upheld "termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions." *Id.*; *see, e.g.*, *Summa v. Hofstra University*, 708 F.3d 115, 126 (2d Cir. 2013) (denial of graduate assistantship and termination of plaintiff's privilege of student employment constituted adverse employment action); *Donnelly v. Greenburg Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (failure of high school teacher to be promoted to tenure was an adverse employment action).

In the instant action, Plaintiff appears to set forth at least seven distinct adverse employment actions, none of which satisfies the threshold of "material adversity." *See Rozenfeld*, 875 F. Supp. 2d at 203-205. The first of Plaintiff's purported adverse employment actions is his "alleged exclusion" by Russo in the hiring decision concerning maintenance worker William Kennedy. *See* Def.'s Mem. at 11. As an initial matter, the Court notes that this allegation is dated September 2007 and is, therefore, time-barred pursuant to the three-year

statute of limitations. *See* Def.'s Rule 56.1 Stat. ¶ 36. Additionally, on the merits, Plaintiff fails to create a triable issue of fact as to whether being excluded from the foregoing hiring decision constitutes a materially adverse action. In *Berry v. Empire Homes Services LLC*, No. 06 Civ. 2354, 2010 WL 1037948, at *9 (E.D.N.Y. Mar. 18, 2010), another court in the Eastern District rejected plaintiff's claim that exclusion from the hiring decision of a subordinate worker constituted a materially adverse action in a disparate treatment claim as well as under the more liberal adversity standard applicable in a Title VII retaliation claim. *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("…it is now clear that Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and "extends beyond workplace-related or employment-related retaliatory acts and harm.") (internal citation and quotations omitted). Like Plaintiff here, the plaintiff in *Berry* had "previously participated in the hiring process," albeit only once before. *Berry*, 2010 WL 1037948, at *11. Plaintiff was consulted by Russo in the previous decision to hire Lopez. *See* Def.'s Rule 56.1 Stat. ¶ 39. *Berry* held further that "plaintiff's exclusion does not qualify as materially adverse since his overall decision-making authority over the hiring process was limited." *Berry*, 2010 WL 1037948, at *12. Similarly, Plaintiff Weinstein had no overall decision-making authority over the hiring of maintenance workers. Accordingly, the Court finds that the exclusion of Plaintiff from the Kennedy hiring decision did not constitute an adverse employment action.

Second, Plaintiff's objection to Russo's supervisory style does not constitute a materially adverse action. Like the Kennedy hiring decision, the two incidents when Plaintiff was questioned by Russo concerning his assignments and subordinates both occurred in 2007 and are thus time-barred. In any event, Russo's presence at Plaintiff's workshop does not qualify as an

adverse employment action since "[e]veryday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII." *Chukwuka v. City of New York*, 795 F.Supp.2d 256, 261 (S.D.N.Y. 2011) (citing *Law Grande v. DeCrescente Distrib. Co.*, 370 Fed. App'x 206, 211 (2d Cir. 2010)).  In any event, even if Russo, Plaintiff's direct supervisor, monitored Plaintiff's work performance, such actions would not be considered materially adverse as a matter of law.  *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) ("micro-management" and "excessive scrutiny" were not adverse employment actions**,** particularly where plaintiff's only evidence of disparate treatment was "her own perception that she was treated differently"); *see also Figueroa v. City of New York*, 198 F. Supp. 2d 555, 568 (S.D.N.Y. 2002) ("[b]eing followed by supervisors is not a materially adverse employment action**.**").

Third, the November 16, 2007 counseling memorandum issued by Russo to Plaintiff also fails to qualify as an adverse employment action.  *See* Holtzer Decl., Ex. G.  Again, this memo pre-dates April 8, 2008 and, therefore, falls outside the applicable three-year limitations period. Further, in the November 16, 2007 counseling memorandum, Russo wrote Plaintiff up for responding to him in a "loud voice" because Russo had questioned why the maintenance workers were running late to work on November 8, 2007.  *See* Holtzer Decl., Ex. G.  Russo explained that Plaintiff's behavior was "inappropriate," for calling into question his "authority as a supervisor in the presence of other staff."  *Id.*  Russo noted that further such incidents could result in "disciplinary action."  *Id.*  Notwithstanding Plaintiff's claims to the contrary, the Second Circuit has held that "in the context of the issuance of a 'counseling memo' . . . criticism of an employee (which is part of training and necessary to allow employees to develop, improve, and avoid

discipline) is not an adverse employment action." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011); *see also Sotomayor v. City of New York*, No. 10 Civ. 3411, 2012 WL1889780, at *21 (E.D.N.Y. May 24, 2012). Moreover, even if Russo was authorized to demote or terminate Plaintiff (which he was not), courts in this Circuit have "declined to find that threats to demote the plaintiff or take disciplinary action constitute an adverse employment action, even for purposes of a retaliation claim." *Taylor v. New York City Dep't of Educ.*, No. 11 Civ. 3582, 2012 WL 5989874, at *10 (E.D.N.Y. Nov. 30, 2012); *Gentile v. Potter*, 509 F.Supp.2d 221, 242 (E.D.N.Y. 2007). Accordingly, the Court finds that the November 16, 2007 counseling memorandum does not constitute an adverse employment action.

Fourth, on June 19, 2008, Russo and Chase met with Plaintiff following complaints by his subordinates about his construction experience. *See* Holtzer Decl., Ex. I. During the meeting, Chase expressed his concern that Plaintiff was unable to perform the duties of a Maintenance Supervisor I. *See* Def.'s Rule 56.1 Stat. ¶¶ 102-103. At issue was Plaintiff's failure to plan for tasks and order necessary supplies, which caused unnecessary delays. *See* Def.'s Mem. at 13. Following the meeting, Chase issued Plaintiff a counseling memorandum which reiterated the items discussed at the meeting as well as Plaintiff's need to comply with the job duties of a Maintenance Supervisor I. *See* Holtzer Decl., Ex. I. Plaintiff was reminded that he was "responsible for supervising and directing the work of the entire district maintenance staff in all aspects of their work." *Id.* Chase wrote that "[i]f you are unable or unwilling to comply with this directive, you will be deemed insubordinate and subject to disciplinary action." *Id.*

At the outset, the Court notes that "being called into a supervisor's office to discuss work issues" does not constitute an adverse employment action. *Morrison v. Potter*, 363 F.Supp.2d

586, 591 (S.D.N.Y. 2005). "Although . . . close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." *Id.* (internal citation and quotations omitted). Similarly, as noted above, a counseling memorandum, such as the one at issue, does not represent an adverse employment action. *See Tepperwien*, 663 F.3d at 570; *see also Williams v. N.Y. City Hous. Auth.*, 335 Fed. Appx. 108, 110 (2d Cir. 2009) (holding in Section 1983 action that defendant's "issuance of two counseling memoranda" did not constitute adverse employment actions). Moreover, even under the more lenient standard applied in retaliation cases, courts have found that counseling memoranda do not qualify as adverse employment actions. *See McPherson v. City of New York*, No. 09 Civ. 4682, 2011 WL 4431163, at *7 (S.D.N.Y. Sept. 23, 2011) ("From an objective standpoint, these critiques—both in person and via memoranda—are all instances of ordinary workplace supervision, oversight, and management."); *Tournois v. Waterloo Premium Outlet/Simon Property Group, Inc.*, No. 12 Civ. 650, 2013 WL 3936465, at *4 (W.D.N.Y. July 30, 2013) (dismissing retaliation claim based upon plaintiff's receipt of a counseling memo since the memo "would not dissuade a reasonable worker from making a charge of discrimination."). As such, the Court declines to find that the June 19, 2008 meeting and the subsequent June 27, 2008 counseling memorandum constitute adverse employment actions.

Next, Defendant's purported failure to discipline Elmer Lopez for cursing at Plaintiff does not constitute an adverse employment action. Plaintiff claims that in July 2008, after complaining to Russo about his subordinate Lopez's failure to report to his assignment on the morning of July 2, 2008, Plaintiff was told by Lopez to "go fuck himself." *See* Def.'s Rule 56.1 Stat. ¶ 119. Plaintiff issued a memo addressed to Lopez, Russo and Chase which memorialized

the incident. *Id.* ¶ 120 (citing Holtzer Decl., Ex. P). Following Russo's inquiry into the incident, witness Enzo Memone told Russo that it was Plaintiff who cursed first and Lopez simply "responded in kind." *See* Russo Dep. at 60-61; *see also* Def.'s Rule 56.1 Stat. ¶ 124. Since Russo was left with "one person saying one thing and another person saying another thing," he declined to take any disciplinary action against Lopez. *Id.* at 62. As the foregoing conduct does not constitute "materially adverse change in the terms and conditions of employment," the Court declines to find that Russo's failure to discipline Lopez for the alleged remarks establishes an adverse employment action. *See Rozenfeld*, 875 F. Supp. 2d at 203-205.

Finally, the Court holds that Plaintiff's October 13, 2008 retirement was voluntary and fails to meet the requirements of a "constructive discharge." Although the parties briefed the issue of constructive discharge as an independent point in their respective memoranda of law, "[a] constructive discharge is functionally the same as an actual termination and therefore is considered an adverse employment action," and should, therefore, be analyzed under the *McDonnell-Douglass* framework within Plaintiff's *prima facie* claim. *See Dall v. St. Catherine of Siena Med. Ctr.*, No. 11 Civ. 444, 2013 WL 4432354, at *7 (E.D.N.Y. Aug. 14, 2013) (internal citation and quotations omitted); *Edwards v. Huntington Union Free School Dist.*, No. 11 Civ. 1408, 2013 WL 3785620, *8 (E.D.N.Y. July 18, 2013) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)). However, the facts underlying Plaintiff's retirement do not arise to a constructive discharge.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Sibilla v. Follett Corp.*, No. 10 Civ. 1457, 2012 WL 1077655,

44

at *11 (E.D.N.Y. Mar. 30, 2012) (citing *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)).  "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.*; *see also Rozenfeld*, 875 F. Supp. 2d at 204.

Here, "Plaintiff fails to demonstrate his workplace was so rife with difficulties and unpleasantness that a reasonable person in his position would have been compelled to resign." *Rozenfeld*, 875 F. Supp. 2d at 204; *see Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 73 (2d Cir. 2000); *see also Stetson v. NYNEX Service Co.*, 995 F.2d 355, 359 (2d Cir. 1993).  In support of his constructive discharge claim, Plaintiff argues that Russo began a "two year period of harassment of [Plaintiff], during which Russo made discriminatory comments to [Plaintiff] based on his religion, demonstrating a clear discriminatory animus."  *See* Pl.'s Mem. at 22.  As further evidence of his purportedly intolerable work atmosphere, Plaintiff points to the 2008 meeting where Chase threatened to demote him as soon as he mentioned retiring at age 65.  *Id.* According to Chase, this was intended to be a demotion in job responsibilities only.  Def.'s Rule 56.1 Stat. ¶ 116.  Plaintiff states that the retort was made "intentionally to try and force [Plaintiff] to retire before he could reach the age of 65."  *See* Pl.'s Mem. at 22.  Plaintiff argues further that during the June 19, 2008 meeting, Chase informed him that if he was demoted or charges were brought against him, he would "lose his medical benefits regardless of any opportunity to challenge such actions."  *Id.*  Finally, Plaintiff believes the intolerable working conditions were reflected in his receiving his "first negative evaluation in his almost 30 year career," allegedly two months after he received the threat of demotion from Chase.  *Id.* (citing Pl.'s Rule 56.1 Stat. ¶¶ 116, 143).

Assessing the evidence in the light most favorable to the non-moving party, the Court notes that even if it were to consider Russo's two time-barred remarks about Jews in 2007, Plaintiff waited nearly a year to resign, notwithstanding Defendant's alleged "two-year harassment campaign." Plaintiff retired on the last possible date that he could retire, namely, October 13, 2008 so that he would still be entitled to the enhanced medical benefits retirement incentive offered by Defendant. *See* Def.'s Rule 56.1 Stat. ¶¶ 142-143. Despite Plaintiff's ability to retire prior to October 13, 2008, Plaintiff chose to remain employed. *Id.* ¶ 144. At his deposition, Plaintiff testified that he did not want to retire one day earlier than the last possible date that the retirement incentive was offered. *See* Pl.'s Dep. at 217. Moreover, the parties agree that Defendant never told Plaintiff that he would be terminated if he refused to retire. *See* Def.'s Rule 56.1 Stat. ¶ 145. Likewise, Plaintiff does not dispute that he did not mention anything about harassment or discrimination in his retirement letter. *See id.* ¶ 139 (citing Holtzer Decl., Ex. K). Taking all of the foregoing circumstances into account, the Court finds that Plaintiff's retirement was not the equivalent of a constructive discharge.

The court's holding in *Rozenfeld* supports the inadequacy of Plaintiff's constructive discharge claim. In *Rozenfeld*, the court found that receiving a negative evaluation or "merely being summoned to an investigative interview" does not set forth a constructive discharge claim. *See Rozenfeld*, 875 F. Supp. 2d at 204. Here, there is no evidence of Plaintiff's alleged "negative evaluation" apart from Plaintiff's self-serving contentions in his opposition papers. However, even assuming the facts in the light most favorable to Plaintiff, receiving a negative evaluation would not constitute a constructive discharge. *See* Pl.'s Mem. at 22; *see also Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) ("a constructive discharge cannot be

proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work…").  Moreover, like the Plaintiff here, the plaintiff in *Rozenfeld* was not "presented with actual disciplinary charges, nor was he threatened with being fired."  *Rozenfeld*, 875 F. Supp. 2d at 204.  Additionally, even though the defendant in *Rozenfeld* was alleged to have called plaintiff "too old," the court found that "taking these allegations together does not demonstrate Defendants deliberately created such difficult or unpleasant working conditions as to warrant Plaintiff's resignation."  *Id.*

Plaintiff's reliance on *Gruber v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist*, 3 F.Supp.2d 280 (E.D.N.Y. 1998) is misplaced.  The facts now before the Court are distinguishable from those in *Gruber* where the plaintiff presented a "pattern of severe and baseless criticism by management over the quality of her performance, nor 'demands' that she retire, nor threats of disciplinary charges or termination if she did not retire."  *Nakis v. Potter*, 422 F. Supp. 2d 398, 416 (S.D.N.Y. 2006) (discussing *Gruber*).  In fact, Plaintiff's claims are more like those in *Nakis* where plaintiff, as in the current action, conceded that defendant never threatened her with termination if she did not retire.  *Id.*

Furthermore, "[c]ourts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he could seek redress for the allegedly intolerable work atmosphere leading up to his resignation, but failed to take advantage thereof."  *Dall*, 2013 WL 4432354, at *10 (internal citation and quotations omitted).  In *Silverman v. City of New York*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002), this Court held that "the fact that [plaintiff] could have sought a hearing before being terminated eviscerates his

claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation."

Here, Plaintiff could have availed himself of the grievance procedures set forth in his union's collective bargaining agreement before resigning. Moreover, Plaintiff does not dispute that if he was disciplined, as a union employee, he would be entitled to the grievance procedures set forth in the CBA and have the opportunity to challenge any such action before a neutral arbitrator. *Id.* ¶¶ 117-118 (citing Holtzer Decl., Ex. N at 19-20). Plaintiff argues that "there is absolutely no evidence that challenging the intolerable work atmosphere would have been an effective remedy." *See* Pl.'s Mem. at 23. Plaintiff further claims that he was told by "union officials" that he would lose his medical benefits "just by being demoted or brought on charges, regardless of a successful outcome in a grievance proceeding." *See* Pl.'s Mem. at 23. However, Plaintiff has set forth only self-serving hearsay statements instead of providing any affidavit from a "union official" substantiating this claim. *Id.* Accordingly, the Court finds that Plaintiff did not suffer a constructive discharge.

Finally, in the alternative, Plaintiff argues that even if the alleged employment actions are "seemingly minor incidents" and not "independently 'adverse'," they may still collectively be sufficient to "establish an atmosphere of adverse employment action[.]" *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002). However, the court in *Phillips* was addressing a Section 1983 First Amendment retaliation claim – not a section 1983 Equal Protection claim such as the one at issue here. *See id.*; *see also Gusler v. City of Long Beach*, 823 F. Supp. 2d 98, 130 (E.D.N.Y. 2011) (While these actions may be de minimis if taken alone, "a combination of seemingly minor incidents over a period of time may give rise to a First Amendment retaliation claim once the

incidents reach a critical mass.") (internal citation and quotations omitted). In either event, even taken together, the foregoing alleged adverse actions are *de minimis* and are far from reaching a "critical mass" even if taken collectively. Accordingly, the Court finds that Plaintiff has failed to set forth an adverse employment action.

Next, Plaintiff fails to demonstrate that a material issue of fact exists regarding the alleged adverse employment actions having occurred under circumstances giving rise to an inference of discrimination. *See Weinstock*, 224 F.3d at 42. Plaintiff has not set forth a triable issue of fact whether age or religion played any role in his exclusion from the William Kennedy hiring decision, Russo's questioning of Plaintiff's supervision in the presence of his subordinates, the November 16, 2007 counseling memorandum, the June 19, 2008 meeting with Russo and Chase, the June 27, 2008 counseling memorandum, the Elmer Lopez incident, or Plaintiff's October 13, 2008 retirement.

In evaluating circumstances in an employment discrimination action, courts should "consider whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *See Bickerstaff v. Vassar* College, 196 F.3d 435, 448 (2d Cir. 1999); *see also Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988) (noting that "direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it" and "[e]mployers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier"). "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to

rely on circumstantial evidence." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994) (internal citation omitted).

Although the Court has held above that the Kennedy Hiring decision would fall outside the three-year statute of limitations, there was no inference of discriminatory animus in Plaintiff's exclusion from the Kennedy Hiring decision in any event. Like the plaintiff in *Berry*, Plaintiff Weinstein was "previously included in the hiring process" of Elmer Lopez. *See Berry*, 2010 WL 1037948, at *9; *see also* Def.'s Rule 56.1 Stat. ¶ 39. Consequently, Plaintiff's exclusion from the Kennedy hiring decision, like *Berry*, lacks any discriminatory inference. *See Berry*, 2010 WL 1037948, at *9. Ultimately, Plaintiff cannot link the alleged discriminatory remarks made by Russo in 2007 because "[a] plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge, is also insufficient." *Aixa Viruet v. Port Jervis City Sch. Dist.*, No. 11 Civ. 1211, 2013 WL 4083229, at *7 (E.D.N.Y. Aug. 13, 2013) (internal citation omitted).

Similarly, Plaintiff fails to establish a material issue of fact with respect to Russo's questioning of Plaintiff in the presence of his subordinates. There is no indication that any of Russo's supervisory inquiries were predicated on age, religion, or any other improper basis. Notably, Russo testified that he met with Pete Mendoza, the Groundskeeping Supervisor, as much as he met with Plaintiff. *See* Pl.'s Dep. at 47; *see also* Russo Dep. at 18-19. Russo also testified that he met with the head custodians employed by Defendant to inquire about their work as well. *See* Russo Dep. at 19. Nor is there any dispute of material fact that the issuance of Russo's November 16, 2007 counseling memorandum - - admonishing Plaintiff for questioning his authority in the presence of staff - - had any inference of discriminatory animus. Plaintiff's

claim that Russo made derogatory remarks about Jews to Plaintiff in 2007 is insufficient to create a material issue of fact. *Aixa Viruet*, 2013 WL 4083229. In any event, as previously discussed, these events are time-barred by the three-year statute of limitations. *See Anand v. New York State Dep't of Taxation & Fin.*, No. 10 Civ. 5142, 2013 WL 3874425, at *12 (E.D.N.Y. July 25, 2013).

There is no material issue of fact that the remaining alleged adverse employment actions were influenced by age or religion as Plaintiff contends. To the extent Plaintiff disputes Chase's reference to Plaintiff's time employed with the District in the June 27, 2008 counseling memorandum, there is no factual dispute that Plaintiff's supervisor was reminding Plaintiff that, despite his years of service, he still lacked critical skills necessary to function as a Maintenance Supervisor I. Moreover, Russo's failure to discipline Lopez following the incident with Plaintiff was not a discriminatory act aimed at the Plaintiff. Plaintiff points to no facts which demonstrate that Russo addressed complaints from similarly situated younger or non-Jewish employees who complained about their subordinates cursing at them but failed to do so with regard to the Plaintiff. *See Quick Cash of Westchester Ave. LLC v. Village of Port Chester*, No. 11 Civ. 5608, 2013 WL 135216 (S.D.N.Y. Jan. 10, 2013) ("Thus, well-pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim.") (internal citation omitted).

Finally, Plaintiff has failed to establish a triable issue of fact regarding his claim that he was compelled to retire on the basis of the District's animus towards his age or religion. Instead, Plaintiff proffers only (1) conclusory statements that the District "intended to oust veteran

employees from the payroll," because of "cost benefits to the District" and (2) an unsupported claim that Chase "bragged to Superintendent Fierson: 'hey boss, I got another one to retire.'" *See* Pl.'s Mem. at 12. Moreover, Plaintiff contends that his position was filled by Harold Turner, who is 15 years younger than Plaintiff and not Jewish. *Id.* However, a plaintiff cannot rely on their own "speculative, and subjective, testimony" to defeat a motion for summary judgment. *See Deebs v. ALSTOM Transp., Inc.*, 346 Fed. Appx. 654, 656 (2d Cir. 2009) (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985) (allowing "a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial" in all employment discrimination actions)). Accordingly, the Court finds that Plaintiff has failed to establish a *prima facie* equal protection claim as a matter of law.

### b. Defendant's Legitimate Non-discriminatory Reasons

As analyzed above, none of the purported actions alleged by Plaintiff amount to actual "adverse employment actions." Consequently, Defendant correctly notes that it "took no adverse action against [Plaintiff]; thus, there is nothing for it to justify." *See* Def.'s Mem. at 17. Nonetheless, reviewing the facts in the light most favorable to the Plaintiff, the Court will review each of the seven actions at issue to assess whether they were founded upon a legitimate non-discriminatory basis. *See Weinstock*, 224 F.3d at 42.

First, concerning the Kennedy hiring decision, Russo had no reason to consult with Plaintiff. Plaintiff had neither the hiring authority nor any "right" to be consulted with respect to this decision. In like manner, there is no issue of pretext here. As Plaintiff's direct supervisor, Russo was justified in questioning Plaintiff with respect to his work assignments and the location

of his subordinates.  For example, on November 8, 2007, Russo noticed Plaintiff's subordinates were running late to work and had good reason within a regular workplace setting to question their direct supervisor, the Plaintiff, regarding their whereabouts.  *See* Def.'s Rule 56.1 Stat. ¶ 49.

Second, Russo's November 16, 2007 counseling memorandum was similarly justified. Russo issued the memorandum to address Plaintiff's inappropriate questioning of his authority in a "loud voice" while in the presence of his subordinates, thereby undermining Russo's authority. *See* Holtzer Decl., Ex. O.  Although Defendant issued a counseling memorandum to address Plaintiff's conduct, the Second Circuit has "generally held that insubordination and conduct that disrupts the workplace are 'legitimate reasons for firing an employee.'"  *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000).  Plaintiff was not fired here, but instead was counseled.  Accordingly, Defendant's actions were legitimate and non-discriminatory.

Third, with respect to the June 19, 2008 meeting concerning Plaintiff's performance and the subsequent June 27, 2008 counseling memorandum issued to Plaintiff, there were legitimate business reasons for proceeding with these actions.  Plaintiff contends that Defendant's failure to point to a single incident where his "alleged lack of experience" impacted the completion of a carpentry or construction project belies Defendant's claims about his supervisory performance. *See* Pl.'s Rule 56.1 Stat. ¶¶ 108.1 – 108.4.  However, during his deposition, Plaintiff testified that "[t]here were certain things that came up where I was not the lead person, but realized, when they hired individuals to work in maintenance, they hired them for their lead skills."  *See* Pl.'s Dep. at 53.  Moreover, Plaintiff acknowledged that he was "reasonably unfamiliar with putting up walls and laying out drop ceilings and that he allowed other employees to take the lead on such projects."  *See* Pl.'s Rule 56.1 Stat. ¶ 26.

Additionally, Assistant Superintendent Chase wrote, among other things, that "[d]espite nearly thirty years in the district, and twenty in your current position, during our conversation you stated that you did not have the expertise in the areas of construction and remodeling to adequately supervise the staff in these areas." *See* Holtzer Decl., Ex. I. Plaintiff said at the meeting that he specialized in heating and ventilation and "lacked confidence in "directing other activities." *Id*. Given Plaintiff's inability to act "*as a working supervisor and perform[] a wide variety of skilled and semi-skilled tasks*," as required in his job description, Defendant had legitimate non-discriminatory reasons to issue Plaintiff a counseling memorandum. *See id.*; *see also Rothenberger v. N.Y. City Police Dep't*, No. 06 Civ. 868, 2008 WL 2435563, at *3 (E.D.N.Y. June 16, 2008) (finding legitimate non-discriminatory reasons for Plaintiff's negative evaluation on account of, among other things, plaintiff's inability "to perform his job without constant guidance" which "meant that his subordinates were not being properly trained, guided and supervised by the plaintiff.").

Next, Russo was justified in not disciplining Lopez, notwithstanding Plaintiff's allegation that Lopez cursed at Plaintiff. As Russo testified, he looked into the matter and spoke to a witness, Enzo Memone, who advised him that it was Plaintiff who cursed at Lopez first, whereas Plaintiff stated otherwise. *See* Def.'s Rule 56.1 Stat. ¶ 129. Given this sparse contradictory evidence, Russo decided he did not have a sufficient basis to discipline Lopez. *Id.* ¶ 130. The Court finds that Defendant had a legitimate reason for not taking any action against Lopez under these circumstances - - one that the Plaintiff has failed to demonstrate was discriminatory.

Finally, Plaintiff was not constructively discharged. As a result, Defendant need not justify Plaintiff's retirement. Nevertheless, Plaintiff claims that the District "implemented a

formal plan to oust veteran district employees" in order to save Defendant money. *See* Pl.'s Mem at 13. Plaintiff neglects to mention that it was the union who proposed the "retirement incentive" to provide "some enhancement for employees who may wish to retire. *See* Chase Dep. at 21. The District weighed the costs and benefits of the proposal, which it ultimately discovered would save money. *Id*. at 22-23. As such, the District was justified in providing, not compelling, Plaintiff and others with a retirement incentive package that ultimately benefited both parties. As a result, the District has come forward with a legitimate non-discriminatory reason for the retirement incentive. Plaintiff has conceded that he did not want to pay for his medical benefits upon retirement. *See* Holtzer Decl., Ex. K; *see also* Pl.'s Rule 56.1 Stat. ¶ 136.

### c. Pretext

The Court finds that there is no material issue of fact on the question of whether Defendant's non-discriminatory reasons are pretexual. *Leibowitz v. Cornell Univ*., 584 F.3d 487, 499 (2d Cir. 2009). With respect to the Kennedy Hiring decision, prior to Kennedy, only one worker, Elmer Lopez, was hired during Russo's tenure. *See* Def.'s Rule 56.1 Stat. ¶¶ 37-38. Russo consulted with Plaintiff in the decision to hire Lopez. *Id*. ¶ 39. Furthermore, in addition to Plaintiff, Russo regularly monitored other supervisors' work areas, including Groundskeeping Supervisor Pete Mendoza and the District's head custodians, including Baltazar Rodriguez. *See id*. ¶¶ 20-22, 58; *see also* Pl.'s Rule 56.1 Stat. ¶ 58. Additionally, Plaintiff fails to point to any other similarly situated employees whose conduct questioned Russo's supervisory status in front of subordinates and who were not similarly counseled. In fact, Plaintiff argues that he was justified in questioning Director Russo because he had been questioned by him in the presence of his subordinates on four occasions. *See* Pl.'s Rule 56.1 Stat. ¶ 56.

Citing to his own deposition, Plaintiff argues that head custodians Beska and Maurice Mullin were not similarly questioned by Russo as he was.  *See* Pl. ¶¶ 56.1 61, 64 (citing Pl.'s Dep. at 121).  However, it is undisputed that other head custodians as well as Groundskeeping Department Supervisor Mendoza were questioned by Russo.  Moreover, the statements Plaintiff attributes to Beska and Mullin are based on Plaintiff's own deposition testimony and, even if true, are inadmissible hearsay and insufficient to defeat a motion for summary judgment.  *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*, 769 F.2d 919, 924 (2d Cir. 1985) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment."); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir. 1999) (plaintiff's "statement as to what he 'was told' was hearsay that would not be admissible at trial. Since [plaintiff] provided no sworn statement from [the declarant], he failed to adduce any evidence sufficient to create a genuine issue of fact.").

With respect to his deficient knowledge of construction and carpentry, Plaintiff conceded that on "certain things" he had the experience necessary to perform or supervise construction work, but not others.  *See* Def.'s Rule 56.1 Stat. ¶ 95.  Moreover, Plaintiff testified that Defendant hired maintenance workers with "lead skills" in areas of construction to work in areas where he could not lead.  *Id*. ¶ 96.  Plaintiff relied on his subordinates to advise him about materials he needed to order for construction projects.  *Id*. ¶ 97.  Although Plaintiff submits that his testimony about his construction experience was relegated to the time *before* he commenced employment with Defendant, there is no indication of that fact anywhere in the record. However, later in his testimony, Plaintiff tacitly conceded his lack of construction experience by testifying that his lack of experience in a certain area of construction, nevertheless, did not affect

his ability to adequately supervise his workers on such projects.  *Id*. ¶¶ 95.1 – 95.5 (citing Pl.'s

Dept. at 61).  The District introduced evidence that there were complaints about Plaintiff's

knowledge of construction projects.  *See* Def.'s Rule 56.1 Stat. ¶¶ 81, 83-84.  Plaintiff argues

that the District should have provided him with training.  However, he also testified that the

position required construction knowledge since the time he commenced employment.  Thus,

Plaintiff was already expected to have knowledge of construction skills.  *See* Pl.'s Rule 56.1 Stat.

¶ 25.1 (citing Pl.'s Dep. at 51).  Accordingly, the Court finds that the reasons articulated by

Defendant for counseling the Plaintiff were not pretextual.

Russo's decision not to discipline Lopez for allegedly cursing at Plaintiff is not pretexual.

As noted previously, witness Enzo Memone stated that Plaintiff was the initiating party and

Lopez responded "in kind, corroborating Lopez's version of events."  *See* Def.'s Rule 56.1 Stat.

¶ 129.  Russo testified that he did not pursue the matter any further because it was an issue of

"one person saying one thing and another saying another."  *Id*. ¶ 130.  There is no evidence

Russo refused to discipline Lopez on the basis of any animus towards Plaintiff's age or religion.

Finally, Plaintiff's retirement was voluntary and concededly chose to take advantage of a

proposal made by the union in its negotiation with the District.  Plaintiff again advances

conclusory testimony that Assistant Superintendent Chase sought to have Plaintiff demoted as

soon as he expressed his interest in retiring at age 65.  *See* Pl.'s Rule 56.1 Stat. ¶ 116.2.  This

unsubstantiated belief is insufficient to defeat a motion for summary judgment.  Accordingly, the

Court finds no basis to support Plaintiff's contention that the reasons proffered by the District

regarding Plaintiff's October 13, 2008 retirement are pretextual.  *See Deebs*, 346 Fed. Appx. 654.

## 2.     Hostile Work Environment

"According to Title VII law, which is utilized by courts considering § 1983 Equal Protection claims, a plaintiff must prove discrimination that was 'sufficiently severe or pervasive' to alter the conditions of his employment in order to prevail on a hostile work environment claim." *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986)). "In addition, to state a hostile work environment claim under Title VII, it is well established that a plaintiff must point to conduct 'severe or pervasive' enough to result in an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Id*. (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)).

Here, the only two comments Plaintiff alleges Russo made about his religion were made in 2007 and the claim asserted on the basis of those comments is time-barred. Moreover, even if the comments at issue were within the limitations period, they are not sufficiently severe or pervasive to be actionable as a matter of law. *See Smith v. HBO*, No. 12 Civ. 2177, 2013 WL 2285185, at *3 (E.D.N.Y. May 22, 2013) (holding that three comments concerning plaintiff's sex were not sufficiently severe or pervasive to be actionable); *see also Petrosino v. Bell Atl.,* 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.") (internal citation omitted). Moreover, the record is devoid of any discriminatory comments on the basis of Plaintiff's age.

To the extent that Plaintiff argues he was subjected to expletives and harassing language from Elmer Lopez whom Defendant failed to discipline, Plaintiff fails to demonstrate a hostile work environment claim as a matter of law. "A plaintiff alleging a hostile work environment

claim must also establish that the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of [a protected category]." *Saunders v. NYC Dep't of Educ.*, No. 07 Civ. 2725, 2010 WL 2816321, at *28 (E.D.N.Y. July 15, 2010) (internal citation and quotations omitted). To the extent that Plaintiff complains about harsh language alone, Plaintiff's claim fails as a matter of law.

Plaintiff's attempt to connect the alleged religious-based comments made by Russo to actions non-religious in nature which unfolded thereafter is unpersuasive. The Court has already determined that the two stray comments are time-barred. Further, Plaintiff's reliance on *Kaytor v. Electronical Boat Co.*, 609 F.3d 537, 547-48 (2d Cir. 2010), *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001), and *Chertkova*, 92 F.3d 81 is unavailing. In the foregoing cases, the courts found a hostile work environment on the basis of far more harsh facts - - including sexually suggestive behavior and threats by a supervisor to choke the plaintiff in *Kaytor*, sexual incidents coupled with comments by the harasser about raping a woman as well as acts of sodomy in *Gregory*, and non-sexual incidents coupled with stories by a harasser of sexual experiences with women and the termination of women from employment in *Chertkova*. Even evaluating the facts in the light most favorable to Plaintiff, there is no triable issue of fact whether Plaintiff suffered from a hostile work environment on the basis of his age or religion.

Finally, although a moot point, Defendant cannot avail itself of the *Faragher-Ellerth* affirmative defense in light of Defendant's lack of an adequate anti-harassment policy. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). Although Defendant has produced evidence of a general equal opportunity, non-

discrimination policy, there is no specific provision within the policy for complaining about instances of workplace harassment. *See* Holtzer Decl., Ex. F; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72-73 (1986) ("Petitioner's general nondiscrimination policy did not address sexual harassment in particular, and thus did not alert employees to their employer's interest in correcting that form of discrimination."). Defendant points to its CBA for the specific complaint procedure; however, the union contract deals specifically with issues governed by the CBA, not equal employment opportunity and workplace harassment. *See* Holtzer Decl., Ex. N at 19-20. In any event, this Court does not find any triable issue of fact concerning Plaintiff's hostile work environment claim.

> **D.**      **Plaintiff's New Assertions in Opposition**

The Court will not consider assertions Plaintiff makes within his opposition papers which contradict his sworn deposition testimony. Where a party submits a sworn affidavit contradicting his deposition testimony, "[t]he rule in the Second Circuit is well-settled that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 378 (E.D.N.Y. Mar. 28, 2012) (citing *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991)) (internal citations omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

In opposition to Defendant's motion, Plaintiff has submitted an affidavit which contradicts numerous items set forth in his earlier deposition testimony. In his narrative of additional facts, Plaintiff asserts that "[a]t all times during his employment with the Garden City Union Free School District ('District') Plaintiff was fully capable and qualified to supervise any and all construction projects that he was asked to complete." *See* Pl.'s Rule 56.1 Stat. ¶ 168 (citing Pl.'s Aff. ¶ 2). However, Plaintiff previously testified that there were "certain things" for which he could not supervise his staff. *See* Pl.'s Dep. at 51. In addition, Plaintiff testified that he was not subjected to a hostile work environment at the time of his retirement. *See id*. at 224. In fact, Russo, who allegedly made the remarks about Jews, had already resigned by the time Plaintiff had retired. *Id.* at 188-89. Plaintiff's affidavit, on the other hand, now proffers that he suffered "intolerable conditions" at the time of retirement. *See* Pl.'s Aff. ¶ 5.

In addition, Plaintiff testified that he was given a negative performance evaluation but it was never placed in his personnel file or used against him. *See* Pl.'s Dep. at 196-98. The affidavit submitted in conjunction with Plaintiff's opposition papers states that he was actually given a negative performance evaluation which was used against him by Defendant (although Plaintiff never produced it as evidence in this action). *See* Pl.'s Aff. ¶¶ 8-9. Finally, for the very first time, Plaintiff states in his affidavit that in 2008, an unnamed "District secretary" in her early 60s was "forced to retire due to her advanced age." *Id.* ¶ 15. Leaving aside that such evidence constitutes inadmissible hearsay insufficient to defeat a motion for summary judgment, the Court has disregarded all testimony which conflicts with Plaintiff's deposition.

**V.    CONCLUSION**

 For all of the reasons set forth above, the Defendant's motion for summary judgment is

GRANTED in all respects and the Complaint is dismissed in its entirety.


       SO ORDERED.


Dated: Central Islip, New York
    September 30, 2013


       /s/ A. Kathleen Tomlinson
       A. KATHLEEN TOMLINSON
       U.S. Magistrate Judge